*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
| :
IRWIN KATZ & ASSOCS., INC.,        :
| :
     Plaintiff,                  :
| :              Civ. Action No.: 3:13-cv-1217(FLW)(LHG)
     v.                          :
| :                          **OPINION**
CONCEPTS IN HEALTH, INC. and       :
HOLLY ROSENTHAL,                   :
| :
     Defendants.                 :
_____     :

**WOLFSON, United States District Judge:**

    Presently before the Court is a Motion for Summary Judgment filed by Defendants Concept in Health ("CIH") and Holly Rosenthal ("Rosenthal") (collectively "Defendants"). In this case, Plaintiff, Irwin Katz & Associates, Inc. ("Plaintiff"), alleges that Defendants breached a contract by failing to provide additional compensation upon the sale, inter alia, of a product, the MidNite Brand (Count I of the Complaint). Plaintiff also alleges that Defendants breached the covenant of good faith and fair dealing inherent in any contract (Count II). In the alternative, Plaintiff seeks reformation of the contract (Count III). Defendant moves for summary judgment on all three counts, and additionally moves to have Rosenthal dismissed from the case as an improper party. For the reasons expressed below, Defendants' Motion for Summary Judgment is **GRANTED** as regards the breach of contract (Count I) and reformation of contract (Count III) claims, and **DENIED** as to the second Count, and as to Rosenthal's personal liability.

**Factual Background**

1

CIH was founded in March 2003 by Rosenthal as a New York limited liability corporation with its principal place of business in New York State. Def. Statement of Undisputed Material Facts (heretofore "Def. UMF") at ¶ 1. In 2007, CIH's business consisted solely of selling "Midnite," a natural sleep aid developed by Rosenthal, to several major chain stores. Def. UMF at ¶¶ 3–4.

Irwin Katz ("Katz") is the president and sole shareholder of Irwin Katz and Associates, Inc.[1], a New Jersey corporation which does marketing sales consulting. Def. UMF at ¶ 10–11. In April 2007, Katz began to perform consulting services for CIH on an informal basis. Id. at ¶ 13. In July 2007, Katz and Rosenthal decided to formalize their relationship. Id. at ¶ 14.

On July 10, 2007, Katz sent Rosenthal an email stating "Attached is a proposed Agreement between us that is based on our conversations and intent . . . . Once we agree, let's have our attorneys review." Def. Ex. D. The draft Agreement attached to the email provided that "Consultant," defined as "Irwin Katz & Associates, Inc.," would provide "Client," defined as Concepts in Health, Inc., with marketing/sales input. Id. at § 1. Under Section 3 of the draft Agreement, entitled "Compensation," Katz would be compensated with a monthly commission of 2% of CIH's sales, plus expenses. Id. at § 3(a). In addition, under Section 3(b), "Consultant will also receive compensation if the client sells Concepts in Health Inc. or its product(s) to a third party," in the amount of "$4000 for each month Consultant was under contract (Agreement) plus a percent of the selling price." Id. at § 3(b) The percentage Katz would receive increased from .5% to 2% of the selling price at six month intervals, then after a total of twenty months increased to 4%. Id. Katz would receive this compensation "from the Client, from the sale of the client's company or products within 30 days of Client's receipt of sale amount from purchaser."

---

[1] As Katz was the only person in Irwin Katz & Assocs., Inc., who worked directly with CIH, the Court will refer to them interchangeably.

Id. Either party would have the right to terminate the agreement, without cause, upon 30 days written notice. Id. at § 2.

Between July 10 and July 12, 2007, Rosenthal modified the draft Agreement, including making several changes to the Compensation section. Def. UMF at ¶ 16. Under this draft, Section 3(b) read "Consultant will also receive compensation if the client sells Concepts in Health Inc. to a third party"; the phrase "or its product(s)" was deleted. Def. Ex. E at § 3(b). In addition, the percentage that Katz would receive if CIH was sold was limited to a percentage "of the Principle's portion (defined as the portion of the company owned by Holly Rosenthal and Howard Bernstein) of the selling price." Id.

On July 16, 2007, Katz emailed Rosenthal with comments on the agreement, saying that he "reviewed your changes to the SERVICE AGREEMENT with my attorney[2]." Def. Ex. F. Among other comments, Katz stated that, "I would like to keep in the statement 'or its products' in 3(b). This prevents the sales of the product(s) but maintaining the Company." Id.

On July 26, 2007, Katz emailed Rosenthal with another draft Agreement. In his email, Katz stated that the agreement "reflects trust on both sides," and that "[t]o do an Agreement that truly protects both our interests would entail hours of work by an attorney that I do not believe is worth while [sic]." Def. Ex. G. In this draft, Section 3(b) read "Consultant will also receive compensation if the client sells Concepts In Health, Inc. or the MidNite Brand to a third party." Id.

According to Katz, Rosenthal prepared another draft Agreement on September 5, 2007. Pl. Statement of Material Disputed Facts ¶ 5–6. This Agreement did not change the wording of Section 3(b). Pl. Ex. 16.

---

[2] Katz, in his deposition, stated that he "had some discussion" about the agreement with an "attorney friend," but did not formally consult with an attorney. Katz Dep. Tr. 98:21 to 99:19.

On September 16, 2007, Katz emailed Rosenthal with "attached changes to the Contract you sent me a couple of weeks ago." Pl. Ex. 18. In the email, Katz stated that the "major changes" were making the contract "a three-year contract," and removing the "reference to the Principle's portion." <u>Id.</u> Section 3(b) again stated that "Consultant will also receive compensation if the client sells Concepts In Health, Inc. or the MidNite Brand to a third party." On September 26, 2007, Katz questioned Rosenthal as to whether she "had a chance to review the changes to our Agreement" and evidently re-sent the agreement on September 27. Pl. Ex. 19; Pl. Ex. 18.

On October 1, 2007, Katz emailed Rosenthal to provide 30 days notice of termination of "our Agreement." Pl. Ex. 20. According to Katz, the "excessive time" he spent working with CIH "has begun to adversely affect my other clients' business and my personal life." <u>Id.</u> Katz then stated that if Rosenthal would like him to remain through the end of the year, that she "advise and indicate you agree to the intentions of the Agreement we were about to sign." <u>Id.</u> Rosenthal responded that "this really takes me aback" and requested time "to digest this." <u>Id.</u>

Later in October, Rosenthal and Katz met for lunch and discussed the draft Agreement. <u>See</u> Pl. Ex. 21 at 1. In an email exchange following the lunch, Rosenthal commented that Katz had "made many contributions to building MidNite," asked Katz to "trust me," and stated "I hope you decide to continue to work with me to build MidNite so we can both make a bucket of money." <u>See id.</u> at 3, 4. Following a request by Katz, Rosenthal sent an email summarizing "the deal" that the parties came to at the lunch. <u>Id.</u> at 1, 2. The "deal" gave Katz a 3% commission rate, and an "'earned' percentage of sales price for business at time of sale. Earn into 4% at rate of 0.5 points per 6 months." <u>Id.</u> at 1. Katz agreed that this deal was his understanding of the lunch conversation. <u>Id.</u>

On November 8, 2007, Katz emailed Rosenthal requesting that their Agreement be formalized. Def. Ex. K. Katz received the next draft of the Agreement on Tuesday, November 13, 2007. Pl. Ex. 23. On November 16, 2007, Katz emailed Rosenthal with questions regarding the definition of "Proceeds of Sale" and whether he would receive compensation if he left "after two years. . . . [E]ven though I accumulated 2%?" Def. Ex. K. Katz concluded by saying that "I believe there is trust between us, but I also believe contracts/agreements should be written with trust and emotions aside." Id. Rosenthal replied, stating "I have made the changes to the percentage part of the contract attached," although it is not clear that any changes were made. Def. Ex. L at 1. No further changes were made to the draft before it was signed. Katz Dep. Tr. 137:7 to 10.

Katz signed the final Agreement on December 17, 2007, and Rosenthal signed it on December 20, 2007. Def. Ex. A. Section 3, "Compensation," provides that "Consultant will be paid a monthly commission of 3% of Client's sales," and that "Consultant will be reimbursed for fall out-of-pocket expenses incurred on behalf of Client." Id. at § 3. In addition, Section 3(c) states:

> Client will also receive a percentage of the Proceeds of Sale of the Company paid to Holly Rosenthal and/or any other non capital contributing partners of the company per the below delineated schedule. Proceeds of Sale are defined as all outright or timed payments made in exchange for ownership of the company and the right to market the MidNite and all other of the company's brands as a result of the sale of the company after all loans to the company and payments to capital partners have been paid.
>
> [Id.]

The schedule provides that Katz would earn a range of percentages from 0.5% to 4%, increasing by .5% every six months. Id. For example, Section 3(c)(4) states:

> Consultant will be paid 2.0% off [sic] the Proceeds of Sale if sale of the company is executed by August 1, 2009 and this agreement is still in effect at that time. Consultant will be paid 2.0% of sales if company is sold any time after August 1, 2009 and this agreement was in effect on August 1, 2009.

> [Id.]

Under the schedule, Katz "earned into" the highest rate, 4%, on August 1, 2011. Id. Section 3(b)(10) states that "Consultant will receive the above Proceeds of Sale no more than 30 days from the date of Client's receipt of sale amount from purchaser." Id. As can be seen by Section 3(c)(4), quoted above, the Agreement is replete with typographical errors, including inconsistent numbering of paragraphs, and mistyped words. The term "company" is not defined. The line on which Rosenthal signed is labelled as "Concepts in Health, Inc.," and the line on which Katz signed is labelled as "Irwin Katz & Associates, Inc." Id.

In early October, 2009, Katz announced his plans to retire. See Pl. Ex. 26. In an email to Rosenthal on October 5, 2009, Katz offered to "stay until you find someone long-term and hopefully, this can be done by the end of the year. If not, I will continue but would like the current agreement revised on point 3.c.5 of the Compensation that is in error." Pl. Ex. 27. On October 25, 2009, Katz sent another email to Rosenthal, with a Letter Addendum attached that "covers the modified Consulting Agreement we discussed." Pl. Ex. 28. According to the letter, Katz's termination notice was rescinded and CIH agreed to compensate Katz an additional $1000 per month. Pl. Ex. 28, Def. Ex. M. In addition, the letter corrected an error in the original signed Agreement, changing Section 3(c)(5) to read "Consultant will be paid 2.5% of sales if company is sold any time after February 1, 2010, and this agreement was in effect on February 1, 2010"; a payment of 2.0% was stated in the original. Id. Katz signed the letter as "Irwin Katz, President"

and Rosenthal signed on a line labelled "Concepts in Health, Inc." Def. Ex. M. The signature of Rosenthal is dated October 25, 2009. Id.

In or around February 2011, CIH introduced the NatuRelief brand, an analgesic providing relief for minor pain. Def. UMF at ¶ 8. In or around April 2011, CIH introduced Nature Garden, a form of MidNite for dollar outlets. Def. UMF at ¶ 8, Pl. Ex. 3 at 8.

The evidence indicates that Rosenthal was continually trying to sell CIH, and that she created multiple documents describing the company for that purpose. One memorandum, apparently created in 2008, states that the contract between CIH and Katz "includes a bonus paid by H. Rosenthal at the time of any sale of the business and his services would terminate at that time." Pl. Ex. 12 at 1. An "acquisition deck" created by Rosenthal in September 2009 uses nearly identical language. Pl Ex. 13 at IK 00806349.

Rosenthal entered into negotiations with Prestige Brand Holdings, Inc. ("Prestige") as early as February 2012, to sell ownership of CIH. Id. at ¶ 31; Pl. Ex. 33. A draft stock purchase agreement, sent out by CIH's investment bankers, Sawaya Segalas and Co. LLC, in June 2012, indicated that Rosenthal would sell ownership of CIH and all of its brands. Id. However, Prestige did not complete the transaction. Id. According to Rosenthal, her investment bankers advised her to attempt to sell MidNite Brand as an asset sale, rather than continue to try to sell CIH. Rosenthal Dep. at 214:4 to 10; Katz Dep. At 248:22 to 249:11. On June 24, 2012, one member of the Sawaya team sent an emailing asking why "we are not selling assets here potentially"; however, another team member responded that Rosenthal's intent was "focused on the CIH entity." Def. Ex. X.

On March 14, 2012, while Rosenthal was negotiating with Prestige, Katz emailed Rosenthal to ask her to review their Agreement. Pl. Ex. 34. Specifically, Katz requested that

Rosenthal "modify [the Agreement] to more simply spell out the percent I am entitled to if you sell all or part of the company," and to ensure any modification included the Addendum. Id. Rosenthal asked Katz to "resend the Addendum you wrote." Id. Katz sent Rosenthal an unsigned version of the Letter Addendum. Id.

In July 2012, Katz asked Rosenthal, apparently orally, if there would be an increase in the compensation percentage because the 4% cutoff date, August 1, 2011, had occurred almost a year earlier. Katz Dep. Tr. at 274:16 to 275:6. Katz asserts that Rosenthal denied that an agreement existed, but stated she would give him a bonus of 2.5% if the company was sold. Id. at 275:10 to 276:10. On July 11, Katz emailed Rosenthal asking "exactly what your intentions are relative to the After Sale Proceeds," and stating that he had the signed Agreement and Letter Addendum. Def. Ex. T at 4. Rosenthal responded "I fully intend to provide you with what I believe (and any objective person would believe) is an unbelievable generous bonus from the proceeds if there is a sale." Id. She also stated "I would like to see what you have that you say I have signed—please send it." Id. Katz replied, stating, "the other day you thought the percent was 2 or 2.5% when we spoke and now you are saying it's a generous bonus." Id. at 3. Rosenthal answered, "What I said was that 2–2.5% was what was in the last 'agreement' you sent me. . . . A generous bonus could potentially be in that range or not." Id. Katz then emailed Rosenthal the signed Agreement and Letter Addendum; Rosenthal responded "Yes, these are clearly my signature. I need to speak with my attorney." Id. at 2. Rosenthal now states that, upon seeing the Agreement, she realized that Katz would be entitled to 4% upon a sale of CIH, but would not be entitled to any compensation in the event of an asset sale. Rosenthal Decl. at ¶¶ 58–59. Any amount he earned would therefore be a "bonus" and within her discretion. Id.

On July 19, Rosenthal emailed her financial consultants, indicating that she "took it upon myself yesterday to calculate my own 'carve out' of NatuRelief expenses." Pl. Ex. 37. Katz was involved in this effort. Id. On September 30, 2012, Rosenthal's attorney sent her a draft Asset Purchase Agreement. Pl. Ex. 39. Rosenthal responded that she was "not sure if the agreement should include NatuRelief—the parties have received information on MidNite only, as much as I would ideally wish to divest both brands." Id. In a "business valuation questionnaire," dated August 29, 2012, Rosenthal described Katz' compensation as including "2.5% of net revenues from the sale of the company." Pl. Ex. 11 at 11.

On December 6, 2012, CIH entered into an Asset Purchase Agreement with Meda Consumer Healthcare, Inc. and Meda AB (collectively "Meda"). Def UMF at ¶ 33. CIH sold the MidNite brand line, the Nature Garden brand line, and a CVS house brand to Meda; the NatuRelief brand was specifically omitted from the transaction. Def. Ex. Q. at Art. 1 (definitions of "Core Products," "Excluded Business," and "Products"), Art. 2.1–2.2. Rosenthal retained ownership of CIH, and the consideration was paid to CIH. Def UMF at ¶¶ 34, 36.

On Thursday, December 13, 2012, Rosenthal informed Katz that MidNite had been sold. See Def. Ex. 41. On December 18, 2012, Katz emailed Rosenthal with three questions. Id. First, he asked about the current "strategy for Concepts in Health/NatuRelief moving forward." Id. Second, he asked about the "status of our Agreement compliance relative to my compensation on the sale." Id. Finally, Katz asked if he should "be planning to spend any time on Concepts in Health after December 31st." Id. Rosenthal responded that she would call him that day. Id.

There is no record of the conversation which occurred on December 18. However, on December 20, 2012, Katz sent a letter to Rosenthal, which mentions such a conversation. Def. Ex. U. Additionally, in her deposition, Rosenthal testified that in a conversation on December

18, 2012, she told Katz that "he was not eligible for payment under the contract, but that I expected that I was going to be giving him a bonus." Rosenthal Dep. 233:22 to 22.

In his December 20 letter, Katz states that, based on their earlier conversations, "it seems that there are two issues between us regarding the payment due to me as a result of the sale of MidNite and Nature Garden" Id. First, according to the letter, "is your interpretation that I am entitled to 2.5% rather than 4%." Id. Second, is that "you [Rosenthal] indicated today that you intend to deduct legal fees incurred by you in calculating the amount due to me as a result of the sale." Id. Katz also reminded Rosenthal that the Agreement called for payment within 30 days from the date of "Client's receipt of sales amount from purchaser." Id.

On December 26, 2012, Rosenthal sent Katz a letter terminating his services to CIH under the Agreement. Def. Ex. V.


**Procedural History**

On January 28, 2013, Irwin Katz and Associates, Inc. ("Plaintiff"), filed a four-count Complaint against Concepts in Health, Inc., and Holly Rosenthal (collectively "Defendants") in New Jersey Superior Court, alleging breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), reformation of contract (Count III), and promissory estoppel (Count IV). Defendants removed the case to this Court on March 1, 2013, on the basis of diversity jurisdiction under 28 U.S.C. § 1332, asserting that the parties are citizens of different states, and the amount in controversy exceeds $75,000.

On March 29, 2013, Defendants filed a Motion to Dismiss all counts, and to dismiss the suit against Rosenthal in her personal capacity. On September 12, 2013, the Court dismissed the promissory estoppel claim. The Court also dismissed the claim for reformation of contract, but

permitted Plaintiff to refile the claim within 20 days. The remainder of Defendants' Motion to Dismiss was denied.

On September 19, 2013, Plaintiff submitted an Amended Complaint, alleging breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), and, in the alternative, reformation of contract (Count III).

Following discovery, Defendants filed a Motion for Summary Judgment, which Plaintiff opposed. Defendants assert: on Count I, the only reasonable interpretation of the contract shows that there is no breach of contract; on Count II, that there is no evidence of ill motive to support a claim for a breach of the implied covenant of good faith and fair dealing; and on Count III, there was no unconscionable conduct entitling Plaintiff to reformation. Additionally, Defendants assert that Rosenthal is not a proper party, and claims against her should be dismissed.

**Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party requesting summary judgment must show that a material fact is not genuinely disputed by "citing to particular materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Id. at 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Kaucher, 455 F.3d at 423.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying the evidence which "demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once that burden is met, the non-moving party has the "burden of producing in turn evidence that would support a jury verdict." Anderson, 477 U.S. at 256. To determine whether a genuine issue exists, the court must view the facts, and all reasonable inferences to be drawn from those facts, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276–77 (3d Cir. 2002).

The Court notes that although Defendants are a New York citizen and a New York corporation, and it is not clear where the contract was signed, the parties do not dispute that New Jersey law governs in this case. This issue was raised at oral argument on Defendants' Motion to Dismiss, and the Court pointed out that the law differs in the two states, particularly on the question of the breach of the covenant of good faith and fair dealing. Motion to Dismiss Tr. 21:20 to 23:3. Although Defendants' counsel reserved the right to raise the issue, id. at 22:23, neither party has cited to New York law, nor raised a conflict of law question in any way. Because the parties concede that New Jersey law applies, that is the law that will be used in this decision.

**Breach of Contract**

In an action involving contract interpretation, "summary judgment is appropriate only where the contractual language is unambiguous—i.e., 'subject to only one reasonable interpretation.'" Mylan, Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 419 (3d Cir. 2013)

(quoting Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 521 (3d Cir. 1999)).

Where the nonmoving party presents a reasonable alternative reading of a contract, "'then a

question of fact as to the meaning of the contract exists which can only be resolved at trial.'" Id.

(quoting Newport Assocs. Dev. Co. v. Travelers Indem. Co., 162 F.3d 789, 792 (3d Cir. 1998).

Under New Jersey law, "a contract is ambiguous 'where the contract is susceptible of

more than one meaning.'" Sumitomo Mach. Corp. of Am., Inc. v. Allied Signal Inc., 81 F.3d

328, 332 (3d. Cir. 1996) (quoting Briggs v. United Shoe Machinery Corp., 92 N.J. Eq. 277, 287

(Err. & App.), cert. denied, 254 U.S. 653 (1920)). In interpreting the contract

> "Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded."
>
> [Id. (quoting Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301 (1953)]

To help with interpretation, a court should "consider, for example, 'the particular

contractual provision, an overview of all the terms, the circumstances leading up to the formation

of the contract, custom, usage, and the interpretation placed on the disputed provision by the

parties' conduct.'" Mylan, 723 F.3d at 419 (quoting Kearny PBA Local No. 21 v. Town of

Kearny, 81 N.J. 208, (1979)). A court is required to examine such evidence to determine if it

demonstrates "the existence of a latent ambiguity"; the court may not "reject such evidence on

the ground that it [finds] the agreement on its face free from ambiguity." Id. at 420.

Defendants assert that the extrinsic evidence proves that the Agreement is unambiguous.

Def. Brief at 11. According to Defendants, the Agreement provides that Plaintiff would receive a

payment only if CIH itself was sold, in conjunction with the right to market MidNite and all other brands. Id. Because CIH itself was not sold, and because CIH retained the right to market NatuRelief, Defendants assert that Plaintiff has no right to payment and there is no breach of contract.

Plaintiff contends that the Agreement is replete with inconsistencies and ambiguities on its face. Pl Brief at 11. However, in light of the extrinsic evidence, Plaintiff argues that it is clear that the parties intended Plaintiff to receive a percentage of any sale of "the business," regardless of whether the form of the sale was an asset or stock purchase, and that "the business" or "the company" was understood by both parties to mean MidNite. Id. at 14–16.

In light of all relevant evidence, the Court cannot find that at the time the contract was signed, the parties understood the clause in question to provide for payment in the event of an asset sale that did not include all of CIH's brands. Although the contract as a whole contains numerous errors and inconsistencies, the clause at issue is unambiguous on its face. The clause provides that Plaintiff will receive a percentage of the "Proceeds of Sale of the Company paid to Holly Rosenthal and/or any other non capital contributing partners of the company." Def. Ex. A. § 3(c). "Proceeds of Sale" is defined as "as all outright or timed payments made in exchange for ownership of the company and the right to market the MidNite and all other of the company's brands." Id. It is clear that "the Company" in the first part of "Proceeds of Sale" definition refers to CIH; indeed, Katz acknowledged as much in his deposition. Def. Ex. BB, Katz Tr. 147:24. Despite Plaintiff's assertions to the contrary, it is illogical to think that the same word, used in the same section, has a different meaning. Furthermore, if "the company" is synonymous with "MidNite," as Plaintiff claims, the language requiring sale of the company and "the right to market MidNite" would be superfluous, violating a basic tenet of contract interpretation. See

Cumberland Cnty. Improvement Auth. v. GSP Recycling Co., 358 N.J. Super. 484, 497 (App.Div.), certif. denied, 177 N.J. 222 (2003) (A logical interpretation of the instruction, like a logical interpretation of a statute or contract, is one that does not render language superfluous, or meaningless); see also Penske Logistics, Inc. v. KLLM, Inc., 285 F. Supp. 2d 468, 474 (D.N.J.2003) ("Under the principles of contract interpretation, a contract should not be given an interpretation which renders a term or terms superfluous or meaningless.") (citing 11 Williston on Contracts, § 32:11(4th ed.1999)).

Plaintiff further asserts that the contract language is "expansive" and covers any transaction, regardless of the form. Pl. Brief at 4. According to plaintiff, the "and" language "accomplish[es] the same goal as the prior draft's use of 'Concepts In Health Inc. or the MidNite Brand." Id. at 5. I disagree. The prior draft used "or" rather than "and," which made it clear that Plaintiff would be entitled to payment in the event of a sale of either the company or the brand. In contrast, the language used in the final Agreement states that Plaintiff will receive a portion of any payments made for the sale of "ownership of the company and the right to market the MidNite and all other of the company's brands." Def. Ex. A. at § 3(c) (emphasis added). Despite other inconsistencies and errors in the Agreement, this pertinent language is not, on its face, ambiguous.

Plaintiff argues that extrinsic evidence both contemporaneous with the drafting of the Agreement and after the Agreement was signed show that "company" and "MidNite" were synonymous to the parties. However, the extrinsic evidence does not create a "latent ambiguity in the contractual language." See Mylan, 723 F.3d at 420. The earlier drafts of the Agreement, and the emails exchanged between Katz and Rosenthal show that Katz was aware of the distinction between the "company," which he knew to be CIH, and its products. In fact, in one

15

email, Katz stated that he wanted to "prevent[] the sales of the product(s) but maintaining the Company"—precisely what occurred here. Def. Ex. F. Although the only product CIH produced at the time was MidNite, Katz expressed concern that the product would be sold separately from CIH. Katz also accounted for the possibility that additional products would be created. This belies Plaintiff's assertion that Katz believed MidNite and CIH to be synonymous. On the other hand, the evidence shows that Rosenthal did not want Katz to receive compensation if only some of CIH's assets were sold, as she removed the phrase "or its product(s)" from his original draft. Def. Ex. E. at § 3(b). Contrary to Plaintiff's argument, the fact that the phrase "or the MidNite brand" later remained in several drafts before being changed does not prove that Rosenthal had accepted that term.

Furthermore, while the parties used the ambiguous phrase "the business" in several different documents, there is no evidence to suggest that either party ever believed "the business" referred only to the MidNite brand. Rosenthal, in one email, stated that Katz would receive compensation upon sale of "the business," but did not clarify the meaning of the term. See Pl. Ex. 21. In contrast, in two later documents, apparently intended for potential buyers of CIH, Rosenthal stated that Katz would receive his bonus upon sale of "the business"—and then stated that Katz' contract with CIH would terminate at that time. Pl. Exs. 12, 13. Yet the Agreement in no way suggests that it relates only to the MidNite brand rather than to the company as a whole. Indeed, following the sale of MidNite to Meda, Katz expressed uncertainty as to whether he would continue with CIH and NatuRelief, but did not seem to believe that the Agreement had automatically terminated. Pl. Ex. 41. The documents describing Katz' "bonus" therefore do not show that "the business" meant only MidNite.

In sum, the evidence presented shows that there is only one reasonable meaning of the contract: that Katz was entitled to compensation upon the sale of CIH and all of its brands. As CIH was not sold, nor were all its brands, Defendants' failure to compensate Katz was not a breach of contract. For that reason, on the issue of breach of contract, Defendant's motion for summary judgment is granted.

### **Good Faith and Fair Dealing**

Under New Jersey law (which the parties do not dispute applies), every contract includes an implied covenant of good faith and fair dealing. Black Horse Lane Assoc., L.P. v. Dow Chem. Corp., 228 F.3d 275, 288 (3d Cir. 2000). This covenant is independent of the duty to perform the express terms of the contract, and may be breached without a violation of the contract terms. Sons of Thunder, Inc. v. Borden, 148 N.J. 396, 423 (1997). There are "myriad forms of conduct that may constitute a violation of the covenant of good faith and fair dealing." Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Associates, 182 N.J. 210, 225 (2005). For that reason, "[e]ach case is fact-sensitive." Id. As a general rule, "[a] plaintiff may be entitled to relief under the covenant if its reasonable expectations are destroyed when a defendant acts with ill motives and without any legitimate purpose." Id. at 226 (citing Wilson v. Amerada Hess Corp., 168 N.J. 236, 251 (2001)). A plaintiff may also get relief if "it relies to its detriment on a defendant's intentional misleading assertions." Id. (citing Bak-a-Lum Corp. v. Alcoa Bldg. Prods., Inc., 69 N.J. 123, 129–30 (1976)). However, "proof of 'bad motive or intention' is vital to an action for breach of the covenant." Id. at 225 (citing Wilson, 168 N.J. at 251).

In certain contracts, one party is given discretion to "make decisions as to . . . conditional aspects of the contract." Wilson, 168 N.J. at 246. In the context of discretionary price-setting, the

New Jersey Supreme Court created a test for "a party exercising its right to use discretion in setting price under a contract breaches the duty of good faith and fair dealing": when the party "exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract." Id. at 251.

Even if a party's actions "do not literally violate any express term of the contract" but the party "withheld vital information from plaintiff with the purpose of exploiting the terms of the contract without regard to the harm caused to plaintiff," the party will be in violation of the covenant of good faith and fair dealing. Brunswick Racquet Club, 182 N.J. at 227. For example, in one case, a contract provided that the plaintiff would be the exclusive distributor for the defendant; defendant decided to terminate the exclusivity portion but withheld that information from the plaintiff for a period of time. Bak-a-lum Corp. v. Alcoa Bldg. Prods. Inc., 69 N.J. 123, 126–27 (1976). The plaintiff, meanwhile, undertook an expansion of its warehouse facilities, which the defendant "knew of and encouraged." Id. at 127. The defendant's "selfish withholding from plaintiff of its intention to seriously impair" the relationship "constituted a breach of the implied covenant of dealing in good faith." Id. at 130.

In a similar case, a plaintiff notified the defendant that it intended to exercise an option to purchase a lease, but the execution of the option "remained unperfected." Brunswick Racquet Club, 182 N.J. at 229. However, "[d]uring a nineteen-month period, defendant, through its agents, engaged in a pattern of evasion, sidestepping every request by plaintiff to discuss the option and ignoring plaintiff's repeated written and verbal entreaties to move forward on closing the ninety-nine-year lease." Id. Rather, "because the successful exercise of the option was not in defendant's economic interest[,] [d]efendant preferred to watch the option die and did not break

18

its silence until after the deadline had passed." Id. The New Jersey Supreme Court concluded that the defendant breached the covenant of good faith and fair dealing through "a demonstrable course of conduct, a series of evasions and delays, that lulled plaintiff into believing it had exercised the lease option properly." Id. at 231.

Defendants assert that there is insufficient evidence of bad intention to sustain a claim of breach of the covenant of good faith and fair dealing. Def. Br. at 20. According to defendants, the duty of good faith and fair dealing arises only in the performance of the contract, and any claims regarding the negotiation of the contract are not actionable. Id. Furthermore, defendants argue that Plaintiff's good faith and fair dealing claim is not distinct from the breach of contract claim. Id. at 21. To the extent that Plaintiff claims that the structuring of the Meda deal violated the covenant of good faith and fair dealing, Defendants allege that the decision "was driven purely by practical economic factors rather than Katz' rights under the Consulting Agreement." Id. at 22.

Plaintiff argues that Rosenthal's actions "display[ed] bad faith at every turn." Pl. Br. at 19. According to Plaintiff, Rosenthal first tried to deny that an agreement existed, and then "restructur[ed] the deal in a way which she believed would preclude plaintiff from compensation." Id. At the same time, Plaintiff asserts, Rosenthal reinforced Katz' expectations by telling third parties that he would "receive a percentage of the proceeds of the sale of the business." Id.; see Pl. Exs. 11, 12, 13. Rosenthal also did not dispute Katz's emailed assertion that he was entitled to a percentage of the sale of "all or part" of the company. Pl. Br. at 20; see Pl. Ex. 34.  Moreover, Plaintiff contends that Rosenthal's statements in her deposition show additional bad faith. Pl. Br. at 21. Rosenthal has now stated that she offered to give Katz a bonus because she intended to pursue an asset deal, which would preclude Katz from recovering the

additional compensation. Id.; Rosenthal Decl. ¶ 59. Yet, Plaintiff states, Rosenthal never told

Katz about her intentions but instead led Katz to believe there would be further discussion of his

additional compensation. Pl. Br. at 21; see Def. Ex. T. Plaintiff also maintains that Rosenthal's

timing of her decision to prepare a "carve out" of NatuRelief—shortly after the email exchange

with Katz—indicates her intention to deprive Plaintiff of compensation. Pl. Br. at 22.[3]

     The Court finds that there remain genuine issues of material facts on the claim of breach

of the covenant of good faith and fair dealing. Plaintiff had, under the Agreement, a reasonable

expectation that he would eventually profit from the sale of CIH. However, according to

Rosenthal, compensation could only occur "in the circumstance of a sale of the <u>entire</u> company

and <u>all</u> of its brands." <u>Rosenthal Decl.</u> at ¶ 28. Looking at the evidence in the light most

favorable to Plaintiff, the Meda deal, which sold the MidNite brand and all other brands except

the NatuRelief brand, precludes Katz from ever receiving the additional compensation that he

reasonably expected under the contract. In that case, Plaintiff was precluded from "receiving

[his] reasonably expected fruits under the contract." <u>Wilson</u>, 168 N.J. at 251.

     Although Defendants assert that there is no evidence of bad intention on Rosenthal's part,

there remains a genuine issue of fact on this question. Albeit Rosenthal repeatedly insists that in

structuring the deal as an asset sale, she acted on her investment bankers' advice, Defendants

have provided no evidence to support this assertion. Notably absent is an affidavit, document, or

deposition from Sewaya Segalas employees on this point. Moreover, Rosenthal's declaration on

this point is hearsay. Rosenthal Decl. ¶43. Furthermore, while there is some evidence that

Sewaya Segalas employees may have thought an asset sale would benefit Rosenthal, there is no

---

[3] Plaintiff's counsel also contends, in hyperbolic fashion, that if these facts do not show bad faith, "no set of facts will ever replicate the bad faith found by" the New Jersey Supreme Court in prior cases. This Court, however, does not agree with this extreme assertion.

evidence that they shared this belief with her. See Def. Ex. X. Indeed, at the time those doubts were expressed, on June 24, 2012, Rosenthal had always been "focused on the CIH entity." Id. It is a logical inference to draw that Rosenthal's later decision to carve out the NatuRelief brand and pursue an asset sale was made in response to Katz' continual assertions that he was entitled to a percentage of any sale proceeds—and to block such an entitlement. As the initial burden in a summary judgment motion is on the moving party, it is Defendants' responsibility to provide evidence of an economic motive; they have not.

Furthermore, Plaintiff may recover if Rosenthal "withheld vital information from plaintiff with the purpose of exploiting the terms of the contract." Brunswick Racquet Club, 182 N.J. at 227. Rosenthal states that as early as July 2012, she was considering an asset deal, and knew that Katz would not be entitled to compensation for such a deal. Rosenthal Decl. at ¶ 59. It is for that reason she began stating that she would provide him with a "generous bonus" if such a transaction occurred. Id. However, Rosenthal never informed Katz that she was considering an asset sale, nor did she correct his misapprehension that he would be entitled to additional compensation in the event of such a sale. While this withholding of information may not rise to the level of egregiousness as in Bak-a-Lum, nonetheless, Rosenthal's actions provide "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher, 455 F.3d at 423 (3d Cir. 2006); Anderson, 477 U.S. at 248. The true motivation for Defendants' action is a question of fact for the trier of fact. Therefore, on the claim for a breach of the covenant of good faith and fair dealing, summary judgment is denied.


**Reformation of Contract**

"The general rule with respect to the reformation of contracts . . . [is that] relief will be granted only where there is mutual mistake or where a mistake on the part of one party is accompanied by fraud or other unconscionable conduct of the other party." Heake v. Atlantic Cas. Ins. Co., 15 N.J. 475, 481 (1954).  A contract may be found unconscionable where "grossly disproportionate bargaining power" between the parties results in "grossly unfair contractual provisions." See Shell Oil Co. v. Marinello, 63 N.J. 402, 408, 307 A2d 598, 601 (1973). The parties agree that any mistake was a unilateral one, see Def. Br. At 23, Pl. Br. at 23, and Plaintiff does not allege that Defendants committed fraud in the formation of the contract. The Court therefore need only look at whether the contract term is unconscionable.

A determination of unconscionability requires a court to examine two factors: "procedural" and "substantive" unconscionability. Rodriguez v. Raymours Furniture Co., 436 N.J. Super. 305, 317 (N.J. App. Div. 2014). Procedural unconscionability "arises out of defects in the process by which the contract was formed, and 'can include a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process.'" Id. (quoting Muhammed v. Cnty. Bank of Rehoboth Beach, 189 N.J. 1, 15 (2006)). Substantive unconscionability "'generally involves harsh or unfair one-sided terms,'" and "'suggests the exchange of obligations so one-sided as to shock the court's conscience.'" Id. (citing Muhammed, 189 N.J. at 15; Sitogum Holdings, Inc. v. Ropes, 352 N.J. Super. 555, 565 (N.J. Ch. Div. 2002)). The analysis of these two factors uses a "sliding scale," such that "overall unconscionability may be found if there is a gross level in one category but only a lesser level in the other." Id.

Defendants argue that there was no procedural unconscionability, as Katz was "a sophisticated businessman" with "extensive experience with written agreements" and thus was "not in a disproportionate bargaining position." Def. Br. at 24. Defendants note that Katz had a month between receiving the final draft Agreement and signing it, during which time he could have consulted an attorney or continued to negotiate; thus, according to Defendants, any misunderstanding of the contract language is a result of Katz' neglect. Id.

Plaintiff, though acknowledging that "with respect to age, literacy, sophistication or basic business acumen, Katz and Rosenthal were on a relatively level playing field," asserts that there was procedural unconscionability as a result of "the setting in which the final writing was prepared and the bargaining tactics Rosenthal now claims to have used." Pl. Br. at 24–25. Plaintiff emphasizes that Rosenthal told Katz to "trust" her and that she is "an innately honest and thankful person." Id. at 25. Plaintiff argues that Rosenthal then drafted a definition of Proceeds of Sale that is "unduly complex and inherently confusing," while Katz "trusted that the writing retained the same meaning" as earlier drafts. Id. at 26–27. Plaintiff then contends that the language is substantively unconscionable, because "additional payment upon sale of the business was a critical term" which enabled Rosenthal "to pay Katz less in monthly compensation than his predecessor." Id. at 27.

The Court cannot find that the contract negotiation was procedurally unconscionable. That Rosenthal asked Katz to trust her, and that she inserted the disputed language into the agreement, did not result in any kind of disproportionate bargaining power between the parties. See Shell Oil Co., 63 N.J. at 408. As noted by Defendants, Katz had the ability and time to read the Agreement before signing, and to seek advice on the contractual language. Furthermore, while Rosenthal asked that Katz trust her, Katz had earlier stated that a draft Agreement "reflects

23

trust on both sides," Def. Ex. G. Moreover, Katz responded to Rosenthal's requests for trust by saying that "contracts/agreements should be written with trust and emotions aside." Def. Ex. K. Lastly, the final Agreement was written under Katz' threat to terminate his relationship with CIH, Pl. Ex. 20, a circumstance which gave Katz additional bargaining power. The setting and bargaining tactics used by Rosenthal in no way created disproportionate bargaining power, nor did they undermine Katz' ability to bargain.

Nor can the Court find that the contract language is substantively unconscionable. The interpretation of the contract which Plaintiff claims is unconscionable is that Katz would only receive his additional compensation in the event that CIH sold the entire company, including the right to market MidNite and all of its other brands, in a single transaction; under this interpretation, following the sale of MidNite to Meda, Katz can never receive his additional compensation. Even this interpretation of the contract, however, is not an "exchange of obligations so one-sided as to shock the court's conscience." Rodriguez, 436 N.J. Super. at 317. Katz may very well have accepted a lower monthly compensation because of his expectations that he would eventually receive a large payout; yet even if that payout will not, now, ever occur, his compensation was not so low as to shock the conscience. Indeed, the evidence shows that he negotiated for, and received, increased compensation on multiple occasions between the signing of the Agreement and the sale of MidNite. See Def. Ex. M, Rosenthal Decl. at 33.

In the absence of any evidence of fraud or unconscionability, the Court cannot grant reformation of the contract. Defendants' motion for summary judgment on Count III is therefore granted.


**Personal Liability of Holly Rosenthal**

As a general rule, "in the absence of a basis for piercing the corporate veil, an officer is not liable for the contractual obligations of a corporation." Home Buyers Warranty v. Roblyn Dev. Corp., No. MER-L-464-05, 2006 WL 2190742, at *4 (N.J. App. Div. Aug. 4, 2006); see also City of Millville v. Rock, 683 F. Supp. 2d 319, 327 (D.N.J. 2010). "[T]he mere fact that an individual executed a contract for the purpose of binding a corporation does not also render that individual liable." Home Buyers Warranty, 2006 WL 2190742, at *4.The person who signs the contract on behalf of a corporation is acting as an agent for that corporation, and "'will not be personally bound unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal.'" Id. (quoting Salzman Sign Co. v. Beck, 176 N.E.2d 74, 76 (N.Y. 1961)   Thus, where "the corporation was unambiguously referred to in the contract as the party to be bound, and the contract is utterly silent as to the imposition of personal liability upon the person executing the contract on behalf of the corporation," the individual signing the contract will not be personally liable. Id.

Plaintiff argues that the language in the Agreement, which states that the Consultant will "receive a percentage of the Proceeds of Sale of the company paid to Holly Rosenthal," creates a personal obligation on behalf of Rosenthal to pay the additional compensation. Pl. Br. at 29. According to Plaintiff, Rosenthal, rather than CIH, is required to pay Katz at the time of a sale, and she is personally liable for the failure to make such a payment. Id. at 29–30. Plaintiff also points to several documents where Rosenthal indicated that the "bonus" Katz would receive upon the sale of the company would be paid by Rosenthal herself. On the other hand, Defendants argue that Rosenthal signed the contract only on behalf of CIH, and cannot be personally liable absent "clear and explicit evidence" that she intended to bind herself personally. Def. Br. at 26.

25

This case is not analogous to <u>Home Buyers Warranty</u>, where the contract was "utterly silent" as to the liability of the individual signing the contract on behalf of the corporation. 2006 WL 2190742, at *4. The language in the contract, when read in the light most favorable to Plaintiff, could impose a personal obligation on Rosenthal. Defendants have pointed to no evidence, beyond the single signature on the contract and Rosenthal's own testimony, to demonstrate that Rosenthal did not intend to be bound by the obligations in the contract.

Moreover, the sole remaining issue in this case is a breach of the covenant of good faith and fair dealing, not breach of contract. Rosenthal, though acting on behalf of CIH, was the person who took the actions which might constitute a breach of the covenant of good faith and fair dealing. By choosing to structure the deal as an asset sale, and by potentially withholding that information from Katz, Rosenthal maybe have prevented Katz from receiving his reasonably expected fruits of the contract. The covenant of good faith and fair dealing is a claim independent of the contractual terms, <u>see</u> <u>Sons of Thunder, Inc.</u>, 148 N.J. at 423. Thus, even if the contract binds only CIH, Rosenthal, as the party potentially responsible for the breach of the covenant of good faith and fair dealing, may be personally liable.

For these reasons, the Court finds that Defendants have not met their burden of showing no genuine dispute of material facts, and therefore denies summary judgment regarding Holly Rosenthal's personal liability.

**<u>Conclusion</u>**

For the reasons expressed above, the Court **<u>GRANTS</u>** Defendants' Motion for Summary Judgment with regard to the claims for breach of contract and reformation. Thus, Counts I and III of the Amended Complaint are dismissed with prejudice. However, the court **<u>DENIES</u>**

Defendants' Motion for Summary Judgment with regard to Count II, breach of the implied covenant of good faith and fair dealing, and denies Defendants' motion to dismiss Holly Rosenthal from the case.