**\*\*NOT FOR PUBLICATION\*\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____  :
                                         :     Civil Action No. 13-1217 (FLW)(LHG)
IRWIN KATZ & ASSOC., INC.,               :
                                         :          **OPINION**
            Plaintiff,                   :
                                         :
      v.                                 :
                                         :
CONCEPTS IN HEALTH, INC. and             :
HOLLY ROSENTHAL,                         :
                                         :
            Defendants.                  :
_____  :

**WOLFSON, United States District Judge**:

      In this contract case, a jury returned a verdict in favor of Irwin Katz & Associates, Inc. ("Plaintiff"), finding that Defendant Concepts in Health, Inc. ("CIH") breached the implied covenant of good faith and fair dealing in the parties' Consulting Agreement.[1]  Defendant Holly Rosenthal ("Rosenthal") (together with CIH, "Defendants") was not found personally liable.  A judgment in the amount of $1,170,000 was entered against CIH.  Three groups of post-trial motions are now before the Court:  (1) Defendants renew their motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and, in the alternative, move for a new trial, pursuant to Federal Rule of Civil Procedure 59(a)[2]; (2) Plaintiff opposes Defendants' Rule 50(b)

---

    [1]  Although only Irwin Katz & Associates, Inc., was a signatory to the Consulting Agreement, due to the closely held nature of that company, the Court will refer to Plaintiff interchangeably with its principal, Irwin Katz ("Katz").

    [2]  Defendant CIH, and not Rosenthal, has filed the instant post-trial motion(s), because Rosenthal was absolved of personal liability by the jury.  However, the Court will refer to the instant motion as having been made by both CIH and Rosenthal because both parties moved for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(a), at the close of Plaintiff's case-in-chief.

and 59(a) motions and, in the alternative, moves to conform the pleadings to the evidence, pursuant to Federal Rule of Civil Procedure 15(b)(2), or for a new trial under the theories of promissory estoppel, equitable estoppel, and breach of contract, pursuant to Federal Rule of Civil Procedure 59(d); and (3) in the event that Defendants' Rule 50(b) motion is denied, Plaintiff moves to alter the existing judgement to include an award of prejudgment interest in the amount of $119,099.15, pursuant to Federal Rule of Civil Procedure 59(e).

Defendants' Rule 50(b) motion for a judgment as a matter of law is GRANTED; Defendants' Rule 59(a) motion for a new trial and Plaintiff's Rule 59(e) motion to alter judgment are DENIED as moot; and Plaintiff's Rule 15(b) motion to conform the pleadings or, in the alternative, for a new trial under Rule 59(d) is DENIED.  A brief summary of the Court's bases for these decision is set forth here, before the more in-depth analysis which follows, *infra*.  The Court grants Defendants' Rule 50(b) motion because, in response to Defendants' pre-verdict Rule 50(a) motions for judgment as a matter of law, Plaintiff waived its argument that Defendants structured the deal with Meda AB in order to deprive Plaintiff of the fruits of the Consulting Agreement, and, as it happened, Plaintiff's decision to abandon its structuring claim was prescient, as no evidence to support it was admitted at trial.  After the Court reserved on Defendants' Rule 50(a) motions, therefore, the only claim with which Plaintiff proceeded, and the only claim that was actually charged to the jury, was that Defendants violated the implied covenant of good faith and fair dealing by failing to inform Plaintiff that Plaintiff was not entitled under the Consulting Agreement to any percentage of the proceeds of the sale of the MidNite brand to Meda AB, while "imploring" Katz to perform work to facilitate that sale.  In evaluating the language of the jury charge in light of the well-established precedents governing the implied covenant of good faith

and fair dealing, however, it is clear that this Court erred in allowing such a claim to be submitted to the jury.

In November 2014, this Court granted summary judgment to Defendants on Plaintiff's breach of contract claim, holding that the Consulting Agreement was unambiguous that Plaintiff was only entitled to share in 4% of the proceeds of a sale of the company and all its brands. The question of the nature of Plaintiff's entitlement under the Consulting Agreement was thus settled as a matter of law and not before the jury. The only question properly before the jury at trial was whether Defendants had engaged in conduct to deprive Plaintiff of its entitlement to a percentage of the proceeds of sale under the Consulting Agreement. When Plaintiff abandoned its argument that Defendant Rosenthal structured the Meda AB transaction as an asset sale specifically to deprive Plaintiff of the 4% to which he would have been entitled under the Consulting Agreement had the sale taken the form of a complete stock purchase transaction — the sale of the whole company and all of its brands — as Rosenthal had always stated was her intention, Plaintiff jettisoned the only argument relevant to Plaintiff's deprivation of an entitlement *under the Consulting Agreement*. Once it was accepted that Defendant Rosenthal did not proceed in bad faith in orchestrating the asset sale, it was immaterial to Plaintiff's rights under the Consulting Agreement whether she acted in bad faith in her communications about the sale. It was the form of the transaction, not any of the representations of the Defendants concerning Plaintiff's rights, which deprived Plaintiff of its expected benefit under the contract. Accordingly, although Plaintiff introduced significant evidence of Defendants' bad faith in discussing payment with Plaintiff, and the jury indeed found, as it was charged, that Plaintiff acted in bad faith in those communications, the elements charged and found by the jury were legally insufficient to establish a claim for breach

of the implied covenant of good faith and fair dealing, because such bad faith communications were legally incapable of depriving Plaintiff of his expectation under the Consulting Agreement.

Moreover, although evidence was introduced at trial relevant to a separate cause of action against Defendants for promissory estoppel on the basis of the discretionary "bonus" that Rosenthal allegedly promised to Plaintiff, but outside of the Consulting Agreement, Rule 15(b)(2) does not permit this Court to conform the pleadings and judgment to the evidence where, as here, the legal theory of promissory estoppel was not actually litigated by the express or implied consent of the parties at trial. Plaintiff's motion on that basis is denied. Similarly, the Court denies Plaintiff's Rule 59(d) motion for a new trial on the theories of promissory estoppel, equitable estoppel, and breach of contract because nothing in that Rule empowers this Court to grant a new trial on causes of action not litigated in the original trial. There is, therefore, no basis for disturbing the Court's grant of judgment to Defendants as a matter of law or for ordering a new trial on any of Plaintiff's claims.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following facts are taken from the exhibits introduced into evidence and transcripts of the jury trial held on February 2nd, 3rd, 4th, and 5th, 2016.[3]

### A.  The Parties' Contract Negotiations and Execution of the Consulting Agreement

---

[3] *See* Trial Transcript, Vol. 1 (Dated February 2, 2016) [hereinafter "1T"]; Trial Transcript, Vol. 2 (Dated February 3, 2016) [hereinafter "2T"]; Trial Transcript, Vol. 3 (Dated February 4, 2016) [hereinafter "3T"]; Trial Transcript, Vol. 4 (Dated February 5, 2016) [hereinafter "4T"]. Because the Court holds that Defendants were entitled to a judgment as a matter of law pursuant to both Federal Rule of Civil Procedure 50(a) and (b), the Court will discuss the evidence introduced by the parties in their respective cases-in-chief together, although the evidence will be analyzed separately under each section of Rule 50.

In 2003, CIH was incorporated by Rosenthal to make "natural healthcare products in the sleep aid category and the pain relief category." 3T84:22-24; 3T90:9-11. CIH distributed an over-the-counter sleep aid developed by Rosenthal called MidNite, which was first launched in "late 2005, early 2006." 3T95:24 to 96:1. As Rosenthal described MidNite:

> MidNite was developed to be the only nonprescription sleep aid that could be taken at any time of night, even in the middle of the night, to be able to get you to sleep fast and wake up alert without any grogginess or drowsiness. It uses all natural ingredients. It comes in a chewable tablet and you can put it by the side of your bed and take it without water in the middle of the night so you don't have to get up.

3T85:5-13; *see* 3T90-16 to 96:1 (discussing Rosenthal's development of MidNite). Rosenthal originally employed a "master broker" named T. Pat McLaughlin to facilitate meetings with vendors to sell MidNite, although that relationship lasted only for a year or two. 3T96:17 to 98:17.

Plaintiff was founded by Katz in 1990 as a business which provides "'a' la carte service[s]. . . . anywhere from marketing to sales input – helping companies start up, new companies form[ ], . . . marketing sales strategies" or helping troubleshoot particular problems. 1T7:11-22; *see generally* 1T8:3 to 9:20. Plaintiff's first contact with CIH occurred sometime in 2006, when Katz saw an ad for the MidNite brand in a trade publication and reached out to Rosenthal to ask "if she needed any marketing or sales help," because he was looking for "interesting products to get involved with" and he was "familiar with most products that were on the market." 1T10:1-19; *see also* 3T104:20 to 105:11. Rosenthal declined his services due to lack of need, but agreed that he could call her in a few months to follow-up on his offer. 1T10:15 to 11:1; 3T104:20 to 105:11.

In or around the end of 2006, or the beginning of 2007, Katz called Rosenthal again to ask her if anything had changed with regard to her need for help, and the two arranged a meeting. 1T11:3-8. Rosenthal and Katz met at the Palisades Mall in Rockland County to discuss the "general terms" of a future relationship. 1T11:1 to 13:6; 3T106:1-2. According to Katz, in

addition to discussing the payment of a monthly commission to Katz, Rosenthal "mentioned [that her] intentions were eventually to sell the company . . . and there would be a payout down the road." 1T13:8-15. Rosenthal provided Katz with a copy of an agreement she had with McLaughlin, which provided for the payment of compensation based both on a percentage of sales and for an "earn-in" on the eventual sale of the company. According to Katz, Rosenthal included the earn-in provision because she was "looking down the road of a more long lasting arrangement." 1T12:17 to 14:13. Katz testified that he had never entered into such an arrangement before, and initially felt it was unfair since his predecessor was earning a higher monthly commission. 1T14:21 to 15:17. However, Katz testified that he soon "understood" that he would "make more money by developing this business" based on the earn-in percentage of the sale of the business he would receive when the business was sold. 1T15:5-21. Katz could not recall whether anything was signed at this meeting, and he testified that he had no record of such a document being executed. 1T15:22 to 16-6. Rosenthal described the parties' conversation at the Palisades Mall as follows:

> Well, when we were originally speaking – the standard is, is to pay him a monthly compensation. But when I first met with him, we met in the Palisades Mall in Rockland County, I shared with him that my goal for this business was to build it and to sell it as fast as I could. He immediately started asking about getting a piece of the action, if I had sold my business; and I frankly was a little taken aback by that because that's not at all standard, and I had spent many years and all my time and all my life's savings starting up this business, and I felt it was maybe presumptuous for him to be asking for that. But when I thought about it, I said I want to make this happen. I want to make my goals happen. I want to be able to be freed up to build my business; and if this will help me, then I was willing to agree to some sort of compensation upon the sale of my company because the sale of my company was my goal.

3T105:24 to 106:16.

On April 1, 2007, Katz began working with CIH, subject to a 90-day trial period. 1T16:8 to 17:2; 3T105:14-15. Katz testified that although he had agreed to only work "two days a week,

or part of two days a week," he was "putting in at least twice that" amount of time.  1T17:3-12. Following the end of the 90-day trial period, in or about June 2007, both parties "recognized it was a benefit to both" of them and they "decided to move forward."  1T17:15-18.

At Katz's request, the parties agreed to enter into a written agreement.[4]  1T17:19-23; 3T105:16-20.  At trial, Katz agreed that it was "fair to say that the consulting agreement was a negotiation between [him] and Ms. Rosenthal that went back and forth over a period of several months."  2T129:13-16.  Of particular importance to this matter, Katz and Rosenthal negotiated the conditions under which Katz would be entitled to share in the proceeds of the sale of the company "and" its brands.  Katz unsuccessfully attempted to include language that would entitle him to a percentage of the sale of CIH's business "or" any of its brands.  *See* 1T24:2-22; 1T25:20-26.

On July 10, 2007, Katz sent an initial draft of the agreement to Rosenthal, *via* email, which provided, in Section 3(b), that Katz would be entitled to an earn-in percentage "if the client sells Concepts In Health Inc. or its product(s)" and that "Consultant will receive the above compensation, from the Client, from the sale of the client's company or products within 30 days of Client's receipt of sale amount from purchaser."  Ex. 2 at IK 00348213-14.  Rosenthal reviewed this initial draft and sent back edits which struck out the language Katz had suggested in Section 3(b).  3T108:19-22.  As Rosenthal explained:

> Q.   Did you have any issue with the way he proposed that compensation arrangement?
>
> A.   Yes, I did.

---

[4] The court permitted Katz to testify as to the negotiation history of this agreement, over Defendants' objection, subject to a limiting instruction given to the jury, that this testimony was "not being received for the parties' understanding or interpretation of the consulting agreement or whether or not there was a breach of the contract, but rather only as background concerning the relationship between the parties."  1T23:10-17.

Q.      What was your issue?

A.      I was not willing to consider compensation in two scenarios: one being sale of the whole company and the other being sale of only its products.

Q.      Why is that?

A.      My goal was to sell my entire company, and my feeling was that he would be helping me -- that I wanted to achieve my goal, and that is what the compensation was for; and if I were to pay him upon the sale of just brands, that I would still be left with the rest of the company that I had to run, that I had to invest in, that I had to deal with all the problems.  It seemed to me that either it was going to be all in or not.  It wasn't that I felt that it was fair for him to get a windfall when good things happen, when I might be left with bad things or problems or issues or the company to run because my goal was to sell the whole company, particularly as time went on, and not have all the aggravations and 24/7 work that this company entailed.

3T107:18 to 108:15.

On July 16, 2007, Katz responded to Rosenthal's edits, *via* email, stating, in relevant part, that he "would like to keep in the statement 'or its products' in 3(b).  This prevents the sales of the product(s) but maintaining the Company."  Ex. 5.  As Katz explained at trial:

Q.      Now, in item A of the email to Ms. Rosenthal, you state:  "I would like to keep in the statement or its products in 3 B.  This prevents the sales of the products but maintaining the company."  Did you write that to Ms. Rosenthal?

A.      Yes.

Q.      And what you meant by that was that if Ms. Rosenthal sold a product and not the whole company, you wanted to make sure that you still received compensation even if she retained ownership of the company.  Isn't that correct?

A.      That is correct.

Q.      You wanted to prevent a situation where you would not be entitled to compensation if only products were sold but ownership of the company was retained.  Isn't that correct?

A.      Yes, that's true.

Q.      But she did not agree to this request.  Isn't that true?

A.      She changed the wording.

Q.      So that the final consulting agreement does not contain the wording that you wanted kept in.  Isn't that correct?

A.      There [were] other drafts in between in which she changed the wording from all its products to the MidNite brand.

Q.      Mr. Katz, I didn't ask you that.

A.      Sorry.

Q.      I asked you the final consulting agreement that you signed did not contain the wording that you wanted to keep in.  Isn't that correct?

A.      That's correct.

2T135:9 to 136:16.  Rosenthal also testified that she did not agree to Katz's request to re-include this language in the contract:

No, not at all.  We had discussions about this and I clarified, once again – I know we had had conversations about it.  I made it very clear that it was only in the event the whole company and all its brands would be sold would I be willing to provide him with additional compensation.

3T109:23 to 110:3.

On July 26, 2007, Katz sent Rosenthal a second draft of the proposed agreement, which included a provision entitling Katz to compensation in the event that Rosenthal sold "Concepts in Health or the MidNite Brand."  Ex. 7 at IK 00350076 (edits omitted).   Although Katz testified that Rosenthal made this edit, he agreed on cross-examination that this language was never accepted by Rosenthal in the final agreement.  *See* 2T137:1 to 138-5.  Rosenthal testified that Katz made this edit, 3T110:4-16, and that it was unacceptable to her:

Q.      Was that revision acceptable to you?

A.      No.  It was essentially the same idea, that he wanted to be paid both in the scenario that I sold the whole company or in the scenario [where] I sold the brand.  I had already explained to him I was not willing to sign an agreement with those two scenarios.

9

3T110:17-22.

Katz testified that in September 2007 he sent another draft of the proposed agreement to Rosenthal which included the language "or the MidNite brand" in the compensation section and that this time, Rosenthal made no change, although, again, this language did not appear in the final version the agreement executed by the parties.[5]  1T2711-25; 1T29:5 to 30:7; 3T110:23 to 111:7; *see also* Ex. 10.

According to Katz, during this negotiation, Rosenthal told Katz to "trust [her,]" and "mentioned many times 'I'm loyal.'  'I'm a person to trust.'"  1T32:13-18.  Katz testified that he did trust Rosenthal, but that on October 1, 2007 – prior to the execution of the Parties' eventual written agreement – Katz sent Rosenthal a letter, *via* email, informing her that he was "resigning effective 30 days."  1T32:19 to 33:6.  As Katz explained:

> I was spending at least twice as much time as the agreement that we were discussing, and it was impacting my other business with other clients and also my personal life because in order to handle the additional workload with Concepts in Health, it was -- I had to work weekends, and I was getting a lot of flak from my wife and grandchildren.
>
> . . . .
>
> I said that I'm giving 30 days to the end of October.  If you would like me to stay on longer until the end of the year -- I gave her a proposal of what I would require financially in order to do that.

1T34:2-14.  Katz testified that Rosenthal was "surprised" by his resignation and stated that she said it "really takes [her] aback."  1T34:18-19.  Katz explained that Rosenthal asked him to put

---

[5] As part of his case-in-chief, Plaintiff read a portion of Rosenthal's deposition transcript, in which she indicated that she did not recall how this language was included in this draft version of the agreement.  3T18:18 to 19:23; *see also* 4T4:10 to 9:6.

together a list of projects that he was working on so that they could get together the following month to go over them.  1T34:23 to 35:6.

When Rosenthal and Katz met, they discussed Katz's "major problem," which was the amount of time he spent working for CIH, and Rosenthal stated that they would "work on reducing the time, the workload, so that [Katz] will have more time. . . for [Katz's] other clients and for [his] personal life."  1T35:16-21.  The parties also discussed what Katz described as "the compensation situation."  1T35:24-25; *see* 1T36:1-20.  Two days later, on October 21, 2007, Rosenthal sent Katz the following email:

> I was glad we were able to speak frankly about the issues concerning our partnership.  I understand your time-related issues and [have] given both of our needs much thought, and I hope my proposed revised expectation and terms are attractive to you.
>
> You have made many contributions to building MidNite, and have been a great help to me.  I truly enjoy working with you and I am hoping that you decide to continue to work on MidNite.

Ex. 16 at IK 00806554.  Katz testified that he interpreted Rosenthal's use of the term "partnership" to mean "[t]hat we were in this together . . . working together on building the MidNite brand." 1T38:19 to 39:6.

On October 22, 2007, Katz thanked Rosenthal for her email, and responded with a question as to "[w]hat happens if [Rosenthal] decide[d] not to sell in the next five years or even longer.  I or my survivors could wait years before receiving compensation.  Do you have any suggestions?" Ex. 16 at IK 00806553.  Rosenthal responded *via* email that same day as follows:

> As much as I truly would like to, as you know I really do not want to get into the type of "guaranteed compensation" that we had discussed before.  This has always made me very uncomfortable, perhaps only because the money is not yet rolling in.
>
> One thought I have is that if after 5 years if you've "earned into" the 4% you can collect 4% of the net profit after taxes if we have not yet sold.

What I can also tell you is that it is truly my intention and strong desire to sell this business sooner rather than later.  This was the whole reason frankly why I went into it.  Let's begin to game-plan this together.

I can also tell you that I believe in being kind, fair and loyal to people who are kind, fair and loyal to me.  I am an innately honest and thankful person.  If we are in the fortunate position to be rolling in the dough I will certainly want to show thanks to you by compensating you in a way that is going to make you happy.  You can rely on that.

I hope you are satisfied with my response above and trust me, and I hope you decide to continue to work with me to build MidNite so we can both make a bucket of money.

Ex. 16 at IK 00806552-53.

Katz testified that his understanding of this email, and specifically that the phrases "rolling in the dough" and "bucket of money," was that they referred to the amount the parties would "make on selling the business," and that he was persuaded by this email to continue to work for CIH. 1T44:4-23.  Accordingly, Katz requested Rosenthal to "summarize the deal in bullet points."  Ex. 16 at IK 00806552.  Rosenthal responded as follows:

Here is the "deal":

- 3% commission commencing November 2007[.]

- You are entitled to "earned" percentage of sales price for business at time of sale.  Earn into 4% at rate of 0.5 points per 6 months.  "Earn in" period started 8/1/07 and extends throughout period of employment

- If business not sold five years from 11/07 (or 11/12) and you have earned into a minimum of 1% of the company, you are entitled to the earned percentage applied to net profit after taxes annually whether or not you are still working for the company[.]

- Your responsibilities are as VP sales managing and handling all sales and trade related functions working a minimum of 16 hours per week.

- Either of us can severe relationship for any reason at any time.

Ex. 16 at IK 00806551.

On October 23, 2007, Katz responded by email that this was his understanding, based on their previous conversation, "except that point two will indicate that I am entitled to the 'earned' percentage of sales even if my employment is terminated by either party prior to the sales. Also, the earned percentage is from August 1, 2007." *Id.* However, as Katz testified at trial, this was not acceptable to Rosenthal, and ultimately never became a part of the parties' written agreement. 1T40:20 to 41:4. Instead, Katz testified that the parties "spoke about it, and she said: 'Trust me. If you are loyal to me, you will get it.'" 1T48:8-19. Accordingly, Katz rescinded his resignation, and Rosenthal informed him she would do a write-up of their agreement. 1T48:18 to 49:1.

On or about November 13, 2007, Rosenthal sent Katz a proposed draft of the agreement.[6] On November 16, 2007, Katz raised two issues regarding the compensation provision of the draft agreement, although neither concerned the issue of what would happen if only a brand, and not the entire company, was sold. Ex. 19. Specifically, Katz's email read:

> I have finally had a chance to review the agreement you emailed me on Tuesday and have several problems with the Compensation section c.
>
> The first problem is that you added for the first time to the definition of Proceeds of Sale "after all loans to the company and payments to capital partners have been paid". I cannot accept this.
>
> The second problem I have is what happens if I leave after 2 years? Does that mean I get nothing if you sell in year 3, even though I accumulated 2%?
>
> Holly, I don't know how we are going to resolve this Agreement issue but I would like it resolved one way or another by the end of the month. I believe there is a trust between us but I also believe contracts/agreements should be written with trust and emotions aside. When you have a chance to digest, let's discuss.

*Id.* Katz testified that he also spoke to Rosenthal about his concerns, and her response was "trust me." 1T52:11-21.

---

[6] In her deposition testimony, which was read to the jury, Rosenthal did not recall who drafted the final Consulting Agreement. 3T22:22 to 23:5.

On cross-examination, Katz testified that he understood, and so did not question, the portion of the document that dealt with sale of ownership of the company, and that he did not request any changes to the draft agreement other than as provided in the November 16, 2007 email. 2T138:6 to 141:11; 2T143:21 to 144:4.  Katz also testified that he had "no hesitancy" in signing the agreement because he "really believed this was going to be a relationship or a partnership of trust."  1T59:2-10.  For her part, Rosenthal testified that Katz did not raise the previous issue of defining the term "proceeds of sale" to include the company or, in the alternative, any of its brands. 3T111:8 to 112:7.

On December 17, 2007, Katz executed the Marketing/Sales Consulting Service Agreement ("Consulting Agreement").  Ex. 22.  Rosenthal executed the Consulting Agreement on December 20, 2007.  The Consulting Agreement executed by the parties defined "Proceeds of Sale" as:

> [A]ll outright or timed payments made in exchange for ownership of the company and the right to market the MidNite and all other of the company's brands as a result of the sale of the company after all loans to the company and payments to capital partners have been paid.

Ex. 22 at IK 00072896.  The Consulting Agreement also contained an integration clause, which provided:   "This Agreement contains the entire agreement by the parties.  Any changes must be agreed to by both parties in writing."  Ex. 22 at IK 00072897.

**B.      Performance and Modifications of the Consulting Agreement**

Katz testified that, going forward from that point, his job at CIH entailed a lot more work than he expected, due to an expansion of the MidNite brand and the growth of the company. 1T59:14-17; 59:18 to 63:4.  In August 2009, the parties exchanged emails regarding Katz's health conditions and the amount of work he was performing for CIH.  Ex. 25.  Katz testified that the parties "[got] past" the issues reflected in their email correspondence "for a period of time," but that they reemerged later in 2009.  1T71:25 to 72:4.  Katz again raised the issue of wanting to

14

reduce his workload because it was "affecting" him, as he explained:  "I reached a point in October

where I was turning 67, and it reminded me at the time, unfortunately, my sister had passed away

at 67 . . . I know I had to slow down and spend more time with my grandchildren and my family."

1T72:6-14.

In September 2009, Katz resigned from CIH again due to the size of his workload and

because he wanted to start taking better care of himself and spend more time with his family.

2T9:5-15.  Rosenthal accepted Katz's resignation, asked him to put together a list of his open

projects, and the parties agreed to meet in person to discuss Katz's resignation.  2T9:21-10:1.

When the parties met on October 19, 2009, Rosenthal asked if Katz would remain in his position

if changes were made and, based on the changes they discussed, Katz again rescinded his

resignation.  2T12:16-24.  Katz subsequently sent Rosenthal a letter as a written modification of

the Consulting Agreement, which Rosenthal signed on October 25, 2009.  That letter provided, in

relevant part:

> This is to acknowledge that based on our modified Consulting Service Agreement
> verbally agreed to on October 21, [2009], I am rescinding my termination notice
> sent on September 28, 2009 and we are reinstating the November 1, 2007
> Agreement [*i.e.*, the Consulting Agreement] with the following modifications.
>
> It was agreed that Concepts in Health will, beginning November 1, 2009,
> compensate Irwin Katz & Associates, Inc. $1,000 additional per month to develop
> and maintain the monthly, quarterly, and period reports necessary to manage and
> evaluate the sales efforts of the company.  This includes managing the monthly
> customer sales deductions taken on the wire transfer report.
>
> In addition, Concepts in Health recognizes there was an error in the original
> MARKETING/SALES  CONSULTING  SERVICE  AGREEMENT  that
> commenced November 1, 2007.  In section 3, COMPENSATION, letter c number
> 5.  It should have read "Consultant will be paid 2.5% of the Proceeds of Sale if sale
> of the company is executed by February 1, 2010 and this agreement is still in effect
> at that time.  Consultant will be paid 2.5% of sales if company is sold at any time
> after February 1, 2010 and this agreement was in effect on February 1, 2010.

Irwin Katz & Associates, Inc. would also like to modify the Agreement to indicate that if Irwin Katz & Associates, Inc. does not exist at the time of the Sale, the Proceeds of the Sale that Irwin Katz & Associates, Inc. would be entitled to based on the Agreement would go to Irwin Katz or his beneficiaries if Irwin Katz is deceased.

Ex. 33.[7]

In January of 2011, Katz's compensation changed from a percentage-based payment to a flat monthly payment of $12,000 per month.   2T17:13-21.   Katz explained that this change occurred because a friend of Rosenthal's, Linda Terjesen, was brought into CIH to "help out," and because she was doing part of Katz's work, he agreed to "take a lower compensation at that time." 2T17:22 to 18:20.   Rosenthal explained the change in Katz's compensation as follows:

Q.      Under the consulting agreement, aside from the proceeds of sale issue, how else was Mr. Katz compensated?

A.      He was paid on a monthly basis.

Q.      How did that start off?

A.      It started off at 3 percent of sales because we felt his role was more sales-oriented.   But, ultimately, there were fluctuations in the payments.   So he said he didn't enjoy having some months that were high and some months that were low. So he actually requested a set monthly payment.   Also at that time, frankly, our sales were beginning to grow dramatically, and I was -- I think one of the last months we were still on the percentage basis, the check was for $29,000 and change.   And looking forward, going into the next year would have entailed paying him well into the 400,000s, 500,000s and it just wouldn't have made any sense given the kind of work, the work he was doing, to be paying him that kind of salary. So either it was going to have to be renegotiated or I would have had to invoke the 30-day termination, which I didn't want to do.   So both of us recognized that and we agreed and he recommended the $12,000 monthly amount that we started at.

3T119:6 to 120:5; *see also* 4T19:17 to 21:23.

---

[7] The Consulting Agreement originally provided that "Consultant will be paid *1.0%* of sales if company is sold at any time after February 1, 2010 and this agreement was in effect on February 1, 2010."   Ex. 22 (emphasis added).

In April 2011, Rosenthal terminated Terjesen and, as a result, Katz's compensation increased from $12,000 per month to $16,000 per month. 2T18:21 to 20:4; 3T2120:6-11; *see also* Ex. 36A.  Neither of these compensation changes were reflected in written agreements between the parties because, according to Katz, "at this point our relationship was evolving, and it was based on – I based it all on . . . what we both discussed in trust." 2T20:5-15; *see also* 3T121:23 to 122:5.  Katz testified that while he did not like being paid on a flat-monthly rate, which resulted in a lower payment than if he were compensated based on the original percentage set forth in the Consulting Agreement, he was more concerned with reducing his workload, as time was a more important consideration to him. 2T22:15 to 25:3.

At this point in the Parties' relationship, Katz testified that it was his hope Rosenthal could bring in someone in to take over some of his workload at CIH. 2T25:1 to 26:21.  To that end, because Katz was in the process of hiring a vice-president of sales to take over some of his duties, Katz felt that the Consulting Agreement should be updated to define his new role (and compensation) going forward. 2T39:21 to 41:13.  Accordingly, on March 4, 2012, Katz emailed Rosenthal and requested that she "review our Sales Agreement," *i.e.*, the Consulting Agreement, and stated that he would "appreciate if you [Rosenthal] could modify it to more simply spell out the percent I am entitled to if you sell all or part of the company.  It should also contain the addendum we added that spells out per my beneficiary." Ex. 46.  When he received no response, Katz followed up with Rosenthal on his request to rewrite the Consulting Agreement in an email dated April 27, 2012. Ex. 48.  Rosenthal responded that they would speak "next week," *id.*, but Katz testified that they never discussed this specific request. 2T43:16-22.

In April 2012, CIH hired Richard Siporin to take over some of Katz's duties. Ex. 48; *see also* 1T75:18 to 76:3; 3T128:4-8.  However, Siporin's employment only lasted two months,

according to Katz, due to a combination of "bad fit," that he was "weak in Excel," and the "straw that broke the camel's back" moment, when both Rosenthal and Katz witnessed Siporin make a failed sales pitch to a buyer in Denver, Colorado.  2T56:8 to 57:2; 61:6 to 62:5; *see also* 3T129:21 to 130-19.  Following that incident, Rosenthal terminated Siporin's employment.  2T62:17-22.  After the termination, Katz was required to again resume all of his previous duties.  2T64:24-25.

Katz testified that his workload also increased in 2012 due to problems arising from another product of CIH, called NatuRelief.[8]  2T52-14 to 53-23.  Katz explained that NatuRelief was not meeting sales quotas in 2012 and, consequently, his workload increased because he had to "orchestrate how we [were] taking that back between our warehouse, our sales reps, the customers.  It just increased the workload substantially."  2T54:6 to 55:4; *see also* 3T222:19 to 224:4.

### C.  Rosenthal Attempts to Sell CIH and the MidNite Brand

Katz testified that he was aware that Rosenthal was attempting to sell the business in late 2009, and that she requested that Katz review a presentation that was put together for a potential buyer, Brynwood Partners.  1T72:18-25.  Although Katz testified that he was not surprised by Rosenthal's request, he did not initially know what Brynwood Partners was.  1T73:23 to 74:2.  Ultimately, Rosenthal's attempt to sell CIH to Brynwood Partners was unsuccessful.  1T8:16-24.

Rosenthal testified that, in addition to attempting to sell CIH herself, she engaged an investment advisory firm named Sawaya Segalas & Co. ("Sawaya") to assist in selling CIH.  According to Michael Rabin, the managing director of Sawaya, "[i]n 2010 and in 2011 [Sawaya] had a series of informal discussion[s], exploratory discussions with Ms. Rosenthal in order to

---

[8] Rosenthal described NatuRelief as "a natural analgesic[] [that] comes in various forms.  It comes in a caplet and a chewable tablet so you could take it during the day and not get water, and also it comes in a naturally [for-women] formula which is for the pain associated with menstrual pain."  3T85:19-24.

18

evaluate opportunities for her to sell her company at that time." 3T135:16-19.  Rabin explained

that Sawaya told Rosenthal that it was "too early for her to explore the sale, and that it would be

better to continue to grow the business." 3T135:23-25.  Rosenthal did eventually formally engage

the services of Sawaya in June 2012.  3T135:9-12; Ex. 53.  Rabin testified that Rosenthal's

intentions were "very clear[,] [s]he wanted to sell the company," 3T136:3-4, and testified in

general about Sawaya's work for Rosenthal with respect to the potential sale of CIH to a company

named Prestige Brands ("Prestige"), which would have been structured as an "stock purchase

agreement," *i.e.*, selling the company and all its brands.  3T137:6 to 141:17; Ex.'s 55; 57.  In that

connection, Sawaya prepared a "confidential information memorandum" to pitch the sale of CIH

to Prestige as a "stock sale," which referenced both of CIH's brands, MidNite and NatuRelief.  Ex.

57; 3T174:9-25.

   According to Rabin, although it was Rosenthal's intention to sell the entire company, a

financial analysis by a company called Riveron indicated that selling the entire company might

not be a feasible option.  *See* 3T142:17 to 148:13.  As Rabin explained:

   Q.    What was the outcome of the Riveron work?

   A.    The outcome of the Riveron work, in short, was that the financial records
   that had been used to prepare the early marketing materials for Concepts in Health
   were not assigning profitability consecutively to the two brands that Ms. Rosenthal
   operated, the MidNite brand and the NatuRelief brand.

   Q.    Did that lead you to arrive at any conclusions as to how a deal should be
   structured?

   A.    It did.

   Q.    What conclusion did you arrive at?

   A.    We concluded that the sale of the company, that is, the sale of both the
   MidNite brand and the NatuRelief brand, would be very challenging.  The reason
   for that is that the NatuRelief brand, while growing, was incurring substantial losses

and reduced the overall profitability of the entity relative to the profitability of the MidNite brand on its own.

Q.      And following that conclusion, did you make any recommendation to Ms. Rosenthal?

A.      We did.  We recommended that she proceed with the sale of the assets of the MidNite brand exclusively.

3T147:16 to 148:13; *see also* 3T165:20 to 166:18; 3T168:19 to 169:5.

On July 9, 2012, Sawaya called Rosenthal to "inform Holly of Prestige's decision not to proceed [with the purchase of CIH] and to discuss the next steps in the sale process for Concepts in Health"; the above-referenced recommendation, to sell the MidNite brand only, was conveyed to Rosenthal in that same call.  3T149:2 to 151:9; Ex. 105; *see also* 3T182:9-10; 3T184:13-17. Rabin testified that Rosenthal was "not in favor of that proposal," but that, "[p]ursuant to [Sawaya's] recommendation, Ms. Rosenthal agreed that the marketing materials [going forward] would focus exclusively on the MidNite brand and not include reference to the Natu[]Relief brand."  3T150:10-19; 3T152:13-16; *see also* 3T191:18 to 193:10; Ex. 106.  Rosenthal described this telephone conversation with Sawaya staff as follows:

They told me that in light of the failed deal on Prestige, and also in light of the analysis done by Riveron that showed not only that NatuRelief was a big problem, but also that MidNite was less profitable than we had originally thought and was less attractive to buyers, that it would be foolish and -- that it made no sense, and that it would be virtually impossible -- very difficult to sell the entire company, and that they wanted to help me have a transaction, and that in order to do so, it only made sense to try to sell the MidNite brand.

Q.      Did they make a recommendation to you?

A.      Yes.

Q.      What was that recommendation?

A.      They told me we should move forward to sell [the] MidNite brand and not the entire company.

Q.      How did you react to that recommendation?

A.      I was very distraught, frankly, because, frankly, it had always been my goal to sell the whole company, and, frankly, a lot of that had to do with my own life. I was just working -- I mean, not 24/7, but I was working around the clock, and there was just a lot of aggravation at that point, and I really just didn't want to do this anymore, research this business anymore, any part of this business.

Q.      Did you accept the recommendation of Sawaya Segalas?

A.      Reluctantly.

Q.      Why did you accept it?

A.      Because they basically told me that I would not be able to sell the business, the total Concepts in Health business, that there really weren't options.

Q.      In learning of that recommendation, and in the discussions that you had with Sawaya Segalas about a sale, did anybody mention Mr. Katz's consulting agreement?

A.      No, nobody mentioned that at all.

Q.      Was that a factor in your decision to accept the Sawaya recommendation?

A.      The code name for -- I think this came up the other day -- for the Sawaya project was "Dream" because it was my life's dream, and that's what it was all about. I never even considered -- it just never dawned on me. I never thought of that aspect about it.

3T186:10 to 188:4.

Katz testified that he was aware that Rosenthal had attempted to sell CIH to Prestige. 2T55:8 to 56:56:7; 2T65:4 to 66:1. Katz further testified that "around July 8th, give or take a day," Rosenthal informed him in a phone call that the potential sale of CIH to Prestige was not going forward, and discussed with Katz what options there were for reducing her role in CIH. 2T65:4 to 66:1. As Katz explained:  "She wanted to maintain certain functions relative to the finance and the advertising[,] but she wanted to rid herself of some of the other things that she was doing." 2T65:23 to 66:1.  The parties discussed two proposals, one in which Plaintiff took on additional

duties, and one in which another company, Emerson Healthcare, who handled CIH's logistical

support, would serve in an expanded role.  2T66:23 to 67:13; *see also* Ex. 59.  Katz testified that

the subject of the parties' agreement for Plaintiff to share in the sale of CIH came up in this

conversation as well:

> Q.      Did the subject of your agreement to share in the sale of the business, did
> that come up in this conversation on July 9, 2012?
>
> A.      Yes.
>
> Q.      How so?
>
> A.      I asked: Now that we keep going on -- again, I asked her -- will I get more
> than the 4 percent that I had accrued up to the prior year? So I wanted to know if
> that could be increased.
>
> Q.      Did she respond to that in the telephone conversation?
>
> A.      At that point she said briefly:  I thought it was 2, 2 1/2 percent at that time.
>
> Q.      Did you respond to her?
>
> A.      We didn't get into it then.  We had to do something.  We just left it at that
> point we would take it up another time.

2T68-10 to 69:1.

According to Rosenthal, she called Katz "within 15 minutes of getting off the phone" with

Sawaya and told Katz:

> [W]hat had been told to me, that Prestige was no longer interested in moving
> forward, . . .  And I told him that we were planning -- that Sawaya Segalas and I
> were planning to have a follow-up meeting early the next week to game-plan what
> the next steps would be because Mr. Sawaya had reassured me that they were going
> to try to -- they were working on my side to try to -- they wanted to make something
> happen for me.

3T184:18 to 185:13; 3T188:7-11.  Rosenthal explained that she called Katz for two reasons:

> First of all, because I kept him informed of everything with every deal that I ever
> was involved in, and there were many -- over the years that we worked together.
> And also, just pragmatically, because I was told by Sawaya Segalas when I was on

the phone with them, that we needed to very quickly pull together information that was appropriate for the sale of just MidNite and not the whole company.

. . . .

There were a lot of things [that had to be done], but the primary thing was all of our financials showed the entire company together.  So what we needed to do, since we were only selling MidNite now, we needed to pull out all of the sales and pull out all of the expenses and restate the financials so it only showed the MidNite brand.  There was a distribution chart that we had put together for the Prestige sale that had columns for MidNite and NatuRelief, all the different items, MidNite and NatuRelief.  So we literally had to – I had to ask Mr. Katz to literally delete the columns for NatuRelief, and there was consumer sales data we needed to pull out of the data there of NatuRelief.

3T188:14 to 189:12; 4T21:24 to 22:19.  At trial, Rosenthal testified that "[o]ne of the first things

Mr. Katz asked about was how this would impact his compensation."  3T189:20-22.  Rosenthal

described their conversation as follows:

I said, [w]ell, you know, I will definitely want to pay you a bonus.  That's not a factor.  I'm going -- you know, I plan to pay you a bonus because that was just not a factor – I'm sorry.  What was the question again?

Q.      Let me ask you a different question?  When you had the conversation with Mr. Katz and reported to him it was only going to be a sale of MidNite, what was the discussion, if any, that you had with him about any percentage of sales?

A.      In that conversation it came up that what was -- Mr. Katz was talking about payment under the contract, and as part of that conversation I told him two things: First, I told him that I felt -- it was my understanding, but I wasn't really prepared for this conversation because I hadn't really thought about it.  But I said it was my understanding, from all of the discussion we had had early on, that I don't think that this sale of MidNite falls within what is covered by the contract, but that I plan to give him a bonus.

Q.      You said there were two things. What was the second thing?

A.      The other thing that came up was, Mr. Katz was asking about payment under the contract, and we got into a, I guess, a sidebar conversation because his understanding was that if it was the deal that it would be -- if it was a deal as covered by the contract, that it would be 4 percent.  And I said it was my recollection that we had discussed and agreed that when he got an increased compensation, the percentage that he would get upon a sale, we agreed would be lowered to 2.5 percent from 4 percent, but that was never -- I got confused because I saw that in

the addendum. That really wasn't relevant anyway, I told him, because we were talking about a bonus now because we were selling an asset rather than selling the company.

Q.      When you make reference to a percentage he would get upon a sale, what kind of sale were you referring to?

A.      He would get a bonus upon the sale of an asset because it would not be covered by the contract.

3T189:24 to 191:16.

On July 9, 2012, Katz sent Rosenthal an email with a proposal that he take over "the sales and administrative responsibilities of the business" in exchange for "changing [his] compensation from $16,000 per month plus expenses to $23,000 per month plus expenses." Ex. 59; *see also* 4T28:21 to 29:15. The email did not mention any change to the Consulting Agreement, either with respect to increasing the percentage of Plaintiff's "earn-in" payment, or changing the definition of "proceeds of sale" to reflect that Katz would be entitled to share in the sale of the MidNite brand alone. Ex. 59.

On July 10, 2012, Katz emailed Rosenthal, and attached an unsigned copy of the October 25, 2009 Addendum to the Consulting Agreement, Ex. 60B, to, as Katz explained, "[j]ust to show her – refresh her memory the 2.5 percent went up to 4 percent, that we were correcting only one spot, one note, on point of the agreement." 2T70:7-9. Katz testified that this email resulted in the parties having a "somewhat bitter conversation." 2T70:11. As Katz explained:

> That is a conversation where we got into my compensation. She was questioning whether there was actually an agreement, and that she was looking at it as a bonus, not something that would be applied to a number, the 4 percent applied to a number of the sale, but something she had decided. I said that's not what the agreement was. That was the basis for it, and I told her that evening that I was extremely disappointed in her memos, what she had to say so long.

2T72:5-14.

That "somewhat bitter conversation" set off a series of emails between the parties, all on

July 11, 2012, which the Court will recount in detail.  Katz first wrote to Rosenthal:

> Holly.
>
> Needless to say I am extremely disappointed in your position relative to our Agreement.  Although you may not care, I am even more disappointed in you personally since I trusted you as I would anyone in my family.  I thought of you as the most moral, loyal and trusting person I have encountered in business.
>
> Before I do anything further relative to Concepts in Health business matters, I need to know exactly what your intentions are relative to the After Sale Proceeds.  I did find the Agreement that you signed on 12/20/07 as well as the letter you signed agreeing to amendments to that Agreement on October 25, 2009.  Prior Agreements aside, what are your intentions and if agreeable, I want it signed off on including my monthly compensation.
>
> I hope you respect my position and I have no problem with you deducting a per diem amount beginning tomorrow until we resolve the situation.

Ex. 62 at IK 00792944.  Rosenthal responded:

> Irwin I know you are very upset and I am very upset (and offended) too[.]
>
> There is no reason not to trust me – I have and am being and have always been very moral, honest and fair, and I fully intend to provide you with what I believe (and any objective person would believe) is an unbelievably generous bonus from the proceeds if there is a sale.  Any other person would be overjoyed and frankly I think it will be well in excess of what is reasonable and fair if/when there is a sale.
>
> I would like to see what you have that you say I have signed – please send it.

*Id.*[9]  Katz responded:

---

[9] At trial, Rosenthal explained that she used the term "generous bonus" in this email because the parties had "just come off a conversation where he had asked me following my conversation with Sawaya Segalas where I agreed that I was going to move forward with an asset sale, and I called him, and he asked me how that related to his compensation, and I told him that I didn't -- my top-of-the-mind thinking was that this sale did not fall within the contract, but that I plan to give him a bonus."  3T205:16-23; *see also* 3T206:14-17 (Rosenthal testified that "[t]he bonus was not dictated at all by the consulting agreement.  The bonus was completely discretionary but something that I wanted to do just because I wanted to do it.").

> Holly.  Attached are the signed Agreements.  What is surprising is that the other day you thought the percent was 2% or 2.5% when we spoke and now you are saying it's a generous bonus.

*Id.* at IK00792943.   Although Katz stated the agreements were attached to that email, they apparently were inadvertently not attached.  *Id.*  Rosenthal responded:

> There is no attachment to your email[.]
>
> What I said was that 2-2.5% was what was in the last "agreement" you sent me.  Please do not imply that I am not being honest – that is frankly inflammatory.  A generous bonus could potentially be in that range or not[.]
>
> I am not making any commitments here.  People deserve extraordinary payouts when they show loyalty from the start to the finish.

*Id.*  Katz responded to that email by sending an email which stated "SEE ATTACHED," with the Consulting Agreement and Addendum attached, *id.*, to which Rosenthal replied:

> Irwin you are correct that I am always going to do what is right and fair.  Yes these are clearly my signature.  I need to speak with my attorney.  My feeling is the least you can do is not leave me in the lurch.  Like I said in the previous email, an extraordinary payout is consistent with someone who is loyal and puts the interests of the business first from start to finish. . . .

Ex. 62 at IK 00792942.  Katz responded to Rosenthal with the following email:

> Holly.  I have always put the interest of your business first to the extent I put off surgeries, doctors['] appointments, working immediately after surgery in the hospital bed, working several hours a day when on vacation, not being with my grandkids on special occasions and putting in over 70 hours (7 days) a week on your business at least two of four weeks a month.  You never understood how much work I had and I never said no to you when you asked me to help with some of your duties.  I was even going to have dinner with Mark this evening even though it is my anniversary because I wanted to confirm that the proposal I presented to you was soundproof before I left for the long weekend.
>
>             . . . .
>
> Holly.  As my July/August Schedule that I emailed you Friday indicated, I am going to Florida for a long weekend.  I would hope your attorney has a chance to review the Agreements by the time I return so we can go forward with some sort of relationship.  I will not leave you in a lurch unless there is reason to.  I think you know me better.

Ex. 62 at IK 00792941.

On July 16, 2012, Katz emailed Rosenthal to see if she had a chance to discuss the matter with an attorney, and to see if the parties could resolve their dispute amicably.  Ex. 63.  Rosenthal responded that she had not yet consulted with an attorney, and was not prepared to resolve the issue yet:

> Irwin I am very upset about this and have not been able to get myself to address it yet and have not spoken with my attorney or anyone else except Howard [Rosenthal's husband].  If you do not want to work until I do, that is fine.  I would like to be able to resolve this but I am going to need to do so when I am ready to. Perhaps that will be by tomorrow – I am not sure.  I appreciate what you say below and I will be in touch.

*Id.*; *see also* 4T32:13-15.

On July 18, 2012, without resolving their dispute concerning the earn-in percentage in the Consulting Agreement, Katz sent Rosenthal an email discussing the work he had performed to "carve out" the sales information for NatuRelief from the information for MidNite, and the further work that needed to be performed, such as "monitoring, maintaining sales data, returns, all the finances separately for the two product lines."  2T85:20 to 86:9; Ex. 108.  According to Rosenthal, this carve-out work was completed in August 2012, so that it could be sent out in a confidential information memorandum to potential buyers of MidNite.  3T198:19 to 199:6.  Katz testified that the reason why Rosenthal asked him to do this work was because Rosenthal told him "[t]he idea was now to sell the MidNite brand and not NatuRelief."  2T86:24 to 87:6.  As Katz explained:

A.      The idea was now to sell the MidNite brand and not NatuRelief.

Q.      Ms. Rosenthal said that to you?

A.      Yes.

Q.      Did she tell you why?

> A.     I really don't recall.  But I had a feeling what it would be.
>
>     . . . .
>
> Q.     Did you understand the work you were doing was to facilitate a sale?
>
> A.     Yes.
>
> Q.     Did you understand the work you were doing was to facilitate a sale in which you would get no part?
>
> A.     Absolutely not.

2T87:3-21; *see* 3T193:11 to 194:6.

Despite the parties' unresolved dispute concerning the amount of the earn-in percentage that might be due to Plaintiff under the Consulting Agreement, Katz testified that he did not have an intention to leave CIH immediately because he "wanted to see how this played out."  2T79:1-3.  As Katz explained:

> I felt I had a vested interest in staying.  I've known that the sale was going to be imminent.  She had really -- she really wanted to sell the business at that point, and I had been there so long, and I felt with some changes that we were considering at the time, that why walk out at this point when there is still the opportunity short-term to reap the rewards of all the time I had put into it.
>
> Q.     What would have been the impact of your departing around that time?
>
> A.     Well, given all the information that was requested, I think it would have been devastating to the company in two different fronts:  One, getting the information to the investment group because at that time [an investment banker] was onboard actively pursuing the sale.  I didn't know who they were, but I was told there were quite a few companies that were interested.  And, second, the management -- she couldn't get anybody short-term to manage the sales that [were] going on there.  Plus the fact we had the situation with NatuRelief in coordinating returns.

2T82:13 to 83:9.

On August 15, 2012, Katz emailed Rosenthal and stated that he wanted to reduce his role, but not resign from CIH, because "he did not want to be involved in an expanded sales relationship

with [the] Emerson [G]roup." Ex. 69 at IK 00273717.  Katz wrote that Rosenthal should "seriously consider alternatives to my involvement with Concepts In Health if that is the direction you intend to move forward with," and offered to "stay involved" with only some aspects of the CIH business. *Id.*  When Rosenthal admonished Katz that it was an issue for her that he "so often threaten[s] resignation," *id.*, Katz replied and clarified that he was not resigning, but only asking to reduce his role because he "wouldn't enjoy being a watchdog over [the Emerson Group's] sales group." *Id.* at IK 00273718.

On October 4, 2012, Rosenthal emailed Katz to request that he check an updated distribution chart "to make sure it is absolutely 100% correct." Ex. 73.  Rosenthal stressed that "[t]his is going to be an intense but very important month" and asked that Katz let her know when he planned to be out of the office.  *Id.*  This conversation resulted in a series of emails in which Rosenthal inquired as to the various medical procedures Katz had planned and their necessity, because October was "a really bad month to be taking personal days unless they are critically necessary." *Id.*; 4T16:21 to 19:6.

On November 7, 2012, Katz emailed Rosenthal that he was "at the point of wanting, no needing, to reduce my involvement at Concepts in Health," and set forth a plan for doing so by shifting some of his duties to an individual identified as "Frank." Ex. 81 at CIH 0010217.  On November 9, 2012, Rosenthal responded with what she would require from both Katz and Frank to implement this plan, but also expressed her concern that the sale of the business would make this change-up unnecessary.  *Id.*  Specifically, Rosenthal wrote:

> I am willing to do this however of course it is possible there will be a transaction sometime in the next month so that training for Frank would be "wasted."  And if the business is not sold, I would be looking for a VP [of] sales so you could retire (I would like to then have Frank report to either me or this new person.)  If you would like to do this now though, I am ok with it.

*Id.* Katz responded to discuss two "scenarios" for hiring Frank in light of the possibility of a transaction "sometime next month." *Id.* at CIH 0010216. However, Katz stated that "regardless, by the beginning of the year, if we are still working together, I need it to be no more than 2.5 days week on an average no matter what," informed Rosenthal of an upcoming personal commitment to be in Florida for Thanksgiving, and let Rosenthal know he was available to discuss the matter whenever it was convenient for her. *Id.*

On December 6, 2012, Rosenthal closed on the sale of the MidNite brand to a subsidiary of Meda AB, a pharmaceutical company based in Sweden, for $39,594,741.[10] Katz testified that he first became aware of the sale on the morning of December 7, 2012, when Rosenthal called him to tell him about the sale. 2T91:5-11; *see also* Ex. 84; 3T216:15-21. According to Katz, when Rosenthal told him the sale of MidNite had taken place, she did not inform him of the purchase price, and she said she could not "get into" his compensation, but promised him they would "talk about it." 2T94:18 to 95:8.

### D.    Termination of the Consulting Agreement

Katz testified that after the sale closed, he had "[v]ery little" communication with Rosenthal. 2T94:11-14; *see* Ex. 130 (email correspondence dated December 7, 2012 discussing costs of a product show). Katz stated that he asked Rosenthal in an email "in a sense: When will I get my earn-in, the 4 percent?" 2T94:16-17. Specifically, Katz sent Rosenthal on December 18, 2012, which stated:

> Hi Holly:
>
> We haven't spoken much since you advised me of the sale of MidNite last Thursday morning. I have several issues/questions that I would appreciate updates on please:

---

[10] The sale of the MidNite brand also included a dollar-store version of the same product, called Nature Garden.

1. What is the strategy for Concepts in Health/NatuRelief moving forward?

  a. When you advised me of the sale, you indicated you could not ship any NatuRelief in inventory because of the *from the marketers of MidNite* on the packages. What are you intentions to address this? We currently have current orders and backorders for all three [stock keeping units]. We should advise the appropriate sales reps of the situation.

  b. We have 2013 Business Plan for 15 customers that reflect first quarter promotional support. Some commitments have already been made but others [are] on hold. How do you want to handle? Those sales reps covering those 15 customers need direction.

  c. If you intend to move forward with NatuRelief, even to phase it out, will Emerson Healthcare be involved?

2. What is the status of our Agreement compliance relative to my compensation on the sale?

3. Should I be planning to spend any time on Concepts in Health after December 31st? If so, we should discuss.

Ex. 92. Katz explained at trial that his second question in that email referred to his "4 percent that [he] had earned on the sale of the product." 2T96:16-21.

Rosenthal responded that she would call Katz that same day. Ex. 92. According to Katz, in that telephone conversation, Rosenthal asked Katz if they could "wait . . . [to] resolve this at the end of January" since she wanted to deduct her legal fees from any amount she would pay Katz, and also referred to the amount of Katz's payment as 2.5%, rather than 4%, of the proceeds of the sale. 2T97:3-9. In response, Katz wrote Rosenthal a letter, dated December 20, 2012, in which he disputed that she could deduct legal fees from his payment, and asserted that he was due 4%, rather than 2.5% of the proceeds of the sale of the MidNite brand:

Dear Holly:

Congratulations again on the sale of MidNite and Nature Garden.

31

I thought over the comments you made in Tuesday's telephone conversation about holding off on paying me the percentage of Proceeds of Sale until the end of January.  You indicated you require additional time since you do not have a total of your legal fees in handling the sale.

Based upon our conversations on this subject, it seems that there are two issues between us regarding the payment due to me as a result of the sale of MidNite and Nature Garden, pursuant to the Consulting Service Agreement developed by you and signed by you on 12/20/07, and then amended on October 25, 200[9].

One issue is your interpretation that I am entitled to 2.5% rather than 4%.  As I indicated in my July 10, 2012 email to you, the October 25, 200[9] amendment changed section 3. COMPENSATION, letter c) number 5 which was clearly in error in the original Agreement.  In no way did it reduce the percentage of Proceeds of Sales from 4% to 2.5% after August 1, 2011 that is reflected in section 3. COMPENSATION, letter c) number 8.

The second disputed issue is that you indicated today that you intend to deduct legal fees incurred by you in calculating the amount due to me as a result of the sale. This is not permitted under the Agreement.  Instead, the Agreement defines "Proceeds of Sale" as "outright or timed payments" and permits the reduction of the "Proceeds of Sale" by "loans to the company and payments to capital partners." Legal fees may not be deducted from "Proceeds of Sale."

I have discussed your comments with my attorney and we feel it's best to resolve our disagreements now rather than at the end of January.  As I am sure you understand, I also will need to have your lawyer provide me (or my lawyer if you prefer) with the closing statement or some other appropriate documentation establishing the amount of the "Proceeds of Sale."

Holly, I would appreciate resolving these disputes in a business-like fashion and within the time period the Agreement calls for which is 30 days from the date of Client's receipt of sales amount from purchaser.

This letter is without prejudice to, and specifically reserves, my rights and remedies under applicable law.

Ex. 93.

Rosenthal testified that she received this letter while on vacation in Paris with her daughter.

3T219:1-9.  Rosenthal described her reaction as follows:

I was astounded.  I was distraught, and I really felt that it was the hand biting -- the dog biting the hand that fed it.  Here I was, and throughout this difficult process, when Mr. Katz had, frankly, continually walked out and done business for his other

clients, and taken a huge excess of vacation days, and, basically, had the attitude that was conveyed in the letter that he sent to his son showing me that he was flouting the needs that I had at that time for his help and partnership. I felt it was really – and here I was, despite all that, and I was still holding out -- I was still planning to provide him with an unbelievably generous bonus, and here he is threatening to sue me.

Q.      Take a look at the last sentence of his letter to you which says: "This letter is without prejudice to, and specifically reserve[s] my rights and remedies under applicable law." How did you react to that?

A.      It was very clear from that and from several of the other phrases in the letter that he had consulted with an attorney. This was a very clear threat that he was planning legal action against me.

3T219:16 to 220-14. Rosenthal testified that this letter was the "straw that broke the camel's back" and that she "decided [she] was not going to pay him a bonus." 3T220:19-24. When she returned from Paris, Rosenthal responded to Katz by letter dated December 26, 2012, terminating the Consulting Agreement, effective 30 days from the date of the letter, pursuant to the Consulting Agreement's termination provision. Ex. 94; 3T221:5-12. Katz did not receive any percentage of the proceeds of the sale of the MidNite brand.

###    E.      Procedural History

On January 28, 2013, Plaintiff filed a four-count Complaint in the Superior Court of New Jersey alleging breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), reformation of contract (Count III), and promissory estoppel (Count IV). On March 1, 2013, Defendants removed the case to this Court based on diversity jurisdiction under 28 U.S.C. § 1332.

On March 29, 2013, Defendants filed a motion to dismiss. On September 12, 2013, this Court granted Defendants' motion in part and dismissed Plaintiff's promissory estoppel claim (Count IV). This Court also dismissed the claim for reformation of contract (Count III), but

permitted Plaintiff to refile the claim within 20 days. The remainder of Defendants' motion to dismiss was denied.

On September 19, 2013, Plaintiff filed an Amended Complaint alleging breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), and, in the alternative, reformation of contract (Count III).  Following discovery, Defendants filed a motion for summary judgment.  On November 19, 2014, this Court granted Defendants' motion for summary judgment in part with respect to Plaintiff's claims for breach of contract (Count I) and reformation (Count III).  2014 U.S. Dist. LEXIS 161680 (D.N.J. Nov. 19, 2014).  Specifically, I held that the definition of the Proceeds of Sale clause in the Consulting Agreement "at issue is on its face unambiguous," *id.* at *21, and that "there is only one reasonable meaning of the contract." *Id.* at *25.  I explained that "Katz was entitled to compensation upon the sale of CIH and all of its brands.  As CIH was not sold, nor were all of its brands, Defendants' failure to compensate Katz was not a breach of contract."  *Id.*  However, I permitted Plaintiff's claim for breach of the covenant of good faith and fair dealing to proceed to trial as the "sole remaining issue in this case."  *Id.* at *39.  As I explained:

> Rosenthal, though acting on behalf of CIH, was the person who took the actions which might constitute a breach of the covenant of good faith and fair dealing.  By choosing to structure the deal as an asset sale, and by potentially withholding that information from Katz, Rosenthal may[] have prevented Katz from receiving his reasonably expected fruits of the contract.

*Id.* at *39-40.  On December 2, 2014, Defendants filed a motion for reconsideration, which I denied on July 13, 2015.  2015 U.S. Dist. LEXIS 90225 (D.N.J., July 13, 2015).  Defendants believed that the depositions and other evidence in the record did not support such an implied covenant claim, but the Court ruled that it must be left to the jury to judge the credibility of Defendants' witnesses

on their motivations for pursuing an asset sale rather than the sale of the company and all of its brands — the core question for any implied covenant claim.

A jury trial was held from February 2 through February 5, 2016, on the "sole remaining issue" of whether Defendants breached the covenant of good faith and fair dealing (Count II) by structuring the transaction as an asset sale and withholding information about the pursuit of an asset sale to deprive Katz of his reasonably expected fruits under the Consulting Agreement.  Katz testified for Plaintiff and Rabin and Rosenthal testified for Defendants.

At the close of Plaintiff's case-in-chief, Defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a).  3T74:16 to 81:13; 4T64:15-20.  In response to Defendants' Rule 50(a) motion, Plaintiff waived its claim that Defendants breached the covenant of good faith and fair dealing by structuring the transaction as an asset sale to deprive Katz of his reasonably expected fruits under the Consulting Agreement.  3T78:10-79:10.  Defendants put on their case and then revived their Rule 50 motion at the close of trial.  The Court reserved judgment on both of Defendants' motions.  3T81:14-15; 4T64:19-20.  The Court accepted the proposed jury charge, and framed the question presented to the jury as follows:

> The Plaintiff in this case claims that the Defendants breached the implied covenant of good faith and fair dealing by purposefully failing to inform Plaintiff that he was not entitled to 4 percent of the Proceeds of Sale under the Consulting Agreement due to the structure of the sale transaction, in order to deny Plaintiff the benefits under the Consulting Agreement. Defendants deny that they withheld such information from Plaintiff in order to exploit the terms of the contract and deny that Plaintiff suffered any injury as a result.

Jury Instr. at 18.

The jury was sent out for deliberations at approximately 3:15pm on a Friday afternoon, and deliberated for approximately one and a half hours, after which it returned a verdict that (1) CIH, but not Rosenthal, breached the implied covenant of good faith and fair dealing in the Consulting Agreement, and (2) awarded damages against CIH in the amount of $1,170,000.

On February 25, 2016, Plaintiff filed the instant motion, pursuant to Federal Rule of Civil Procedure 59(e), to alter the judgment to include an award of prejudgment interest. On February 26, 2016, Defendant CIH filed one of the instant motions for a judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 or, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59. The trial transcripts were docketed on April 5, 2016.

On August 25, 2016, after reviewing the trial transcripts and the parties' post-judgment briefing and conferring with the parties, through counsel, via telephonic conference, the Court ordered the parties to provide supplemental briefing on whether, in the event the Court were to grant Defendants' Rule 50(b) motion, it would be appropriate for the Court to entertain a motion from Plaintiff, pursuant to Federal Rule of Civil Procedure 59(d), for a new trial under the theory of promissory estoppel.[11] Plaintiff filed its supplementary brief on September 16, 2016, arguing that (i) even were the Court to find that the evidence admitted at trial did not support the jury's verdict, the Court may nevertheless affirm the judgment in Plaintiff's favor by conforming the pleadings under Rule 15(b)(2) to the evidence of promissory estoppel admitted at trial; (ii) were the Court to grant Defendants' Rule 50(b) motion, to prevent a manifest injustice in setting aside

---

[11] The Court's review of the trial transcripts uncovered numerous instances in which evidence was introduced that *after* the execution of the final version of the Consulting Agreement, Rosenthal had potentially induced Katz to continue working with CIH through the promise of a discretionary "bonus," separate and apart from any entitlement under the consulting agreement. In its original Complaint, Plaintiff had pleaded a cause of action for promissory estoppel, substantially predicated on Rosenthal's conduct *before* the execution of the Consulting Agreement, and seeking recovery for the payments allegedly promised in the Agreement. On Defendants' motion, the Court dismissed this promissory estoppel claim as barred by the existence of the final Consulting Agreement. Because the evidence introduced at trial offered potential support for a promissory estoppel claim based, not upon the promises contained in the Consulting Agreement, but upon the possible subsequent promise of a bonus, that claim would not have been barred by the Court's dismissal, with prejudice, of Plaintiff's earlier promissory estoppel theory. The Court therefore asked the parties to brief whether Rule 59(d) might provide an avenue for post-judgment relief to enable Plaintiff to raise this new claim in a new trial.

the jury's verdict, the Court also should grant Plaintiff a new trial under Rule 59(d) on the theories of promissory estoppel, equitable estoppel, and breach of contract.  The Court construes Plaintiff's requests in briefing as post-judgment motions.  Defendants opposed Plaintiff's motions.  All supplementary briefing was completed on October 7, 2016.

## II.   STANDARD OF REVIEW

### A.   Rule 50 Motion for Judgment as a Matter of Law

Rule 50(a) provides that "[i]f a party has been fully heard on an issue during a jury trial," a court may grant a motion for judgment as a matter of law where the "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party[.]"  *See* Fed. R. Civ. P. 50(a).  "The Rule provides that 'the court *may* determine' that 'there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on [a given] issue,' and '*may* grant a motion for judgment as a matter of law against that party ... .' Thus, while a district court is permitted to enter judgment as a matter of law when it concludes that the evidence is legally insufficient, it is not required to do so. To the contrary, the district courts are, if anything, encouraged to submit the case to the jury, rather than granting such motions."  *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 405 (2006) (quoting Fed. R. Civ. P. 50(a)) (emphasis in original).[12]

---

[12] The Supreme Court in *Unitherm* adopted the long-established interpretation of Rule 50 set forth in the treatise by Wright and Miller.

> Even at the close of all the evidence it may be desirable to refrain from granting a motion for judgment as a matter of law despite the fact that it would be possible for the district court to do so. If judgment as a matter of law is granted and the appellate court holds that the evidence in fact was sufficient to go to the jury, an entire new trial must be had. If, on the other hand, the trial court submits the case to the jury, though it thinks the evidence insufficient, final determination of the case is expedited greatly. If the jury agrees with the court's appraisal of the evidence, and returns a verdict for the party who moved for judgment as a matter of law, the case is at an end. If the jury brings in a different verdict, the trial court can grant a renewed motion for judgment as a matter of law. Then if the

If the Court denies or reserves decision on a Rule 50(a) motion, the moving party may file a renewed motion for judgment as a matter of law under Rule 50(b) no later than 28 days after judgment is entered.  Fed. R. Civ. P. 50(b).  Rule 50(b) provides that, in deciding a 50(b) motion, the court may: "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law."  *Id.*

The standard for deciding the renewed motion is the same as the standard for deciding the motion made at trial.  *Neville Chem. Co. v. Union Carbide*, 422 F.2d 1205, 1210 n.5 (3d Cir.), *cert. denied*, 400 U.S. 826 (1970).  Judgment as a matter of law under Rule 50 "should only be granted if the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief."  *Levine v. Voorhees Bd. of Ed.*, No. 071614, 2010 U.S. Dist. LEXIS 68277, *2 (D.N.J. July 9, 2010) (quoting *Raiczyk v. Ocean Cnty Veterinary Hosp.*, 377 F.3d 266, 269 (3d Cir. 2004) (citation and internal quotation marks omitted)).  "The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict."  *Id.* (quoting *Johnson v. Campbell*, 332 F.3d 199, 204 (3d Cir. 2003)) (citation and internal quotations marks omitted); *see also Villanueva v. Brown*, 103 F.3d 1128, 1133 (3d Cir. 1997) ("A judgment as a matter of law must be sustained if the record is critically deficient of the minimum quantum of evidence from which the jury might reasonably afford relief.") (citation omitted).  When deciding a motion for judgment as a matter of law, courts must look at the evidence and justifiable inferences most favorable to

---

appellate court holds that the trial court was in error in its appraisal of the evidence, it can reverse and order judgment on the verdict of the jury, without any need for a new trial. *For this reason the appellate courts repeatedly have said that it usually is desirable to take a verdict, and then pass on the sufficiency of the evidence on a post-verdict motion.* 546 U.S. at 405-06 (quoting 9A Wright & Miller, Fed. Prac. & Proc. Civ. § 2533 (3d ed.), at 319) (emphasis added).

the prevailing party.  *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 258-59 (3d Cir. 1987), *cert. denied*, 488 U.S. 1004 (1989); *see also Rotondo v. Keene Corp.*, 956 F.2d 436, 438 (3d Cir. 1992).

### B.  Rule 15 Motion to Conform the Evidence to the Pleadings

"Rule 15(b) provides for the amendment of a complaint during and after trial under two circumstances. The first is when an objection requires that the complaint be amended in order to better facilitate the presentation of evidence on the merits of the claims. Fed. R. Civ. P. 15(b)(1)." *Swiatek v. Bemis Co.*, 542 F. App'x 183, 188 (3d Cir. 2013).  In the second circumstance, "Rule 15(b)(2) allows for the amendment of a complaint to conform to the evidence offered at trial, as long as the parties consent either expressly or impliedly." *Addie v. Kjaer*, 737 F.3d 854, 867 (3d Cir. 2013) (citing Fed. R. Civ. P. 15(b)(2)). To determine whether a party has impliedly consented to the amendment of a pleading, courts look to:

> whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond.

*Id.* (quoting *Douglas v. Owens,* 50 F.3d 1226, 1236 (3d Cir.1995)). "Furthermore, 'an issue has not been tried by implied consent if evidence relevant to the new claim is also relevant to the claim originally pled, because the defendant does not have any notice that the implied claim was being tried.'" *Id.*  "Rule 15(b)(2) states that an amendment to conform the pleadings to the evidence actually presented at trial may be made upon the motion of any party at any time, even after judgment. Thus, the rule permits the motion to be made throughout the entire period during which the action is in the district court, including . . . after the return of the verdict."  6A Wright & Miller, Fed. Prac. & Proc. Civ. § 1494 (3d ed.)

"The main consideration in determining whether leave to amend under Rule 15(b) should be granted is prejudice to the opposing party." *Swiatek*, 542 F. App'x at 188 (citing *United States v. Hougham,* 364 U.S. 310, 315 (1960)).   "Prejudice under the rule means undue difficulty in prosecuting a lawsuit as a result of a change of tactics or theories on the part of the other party." *Deakyne v. Commissioners of Lewes*, 416 F.2d 290, 300 (3d Cir. 1969).   "The party opposing the amendment should not succeed by arguing a technical change in the 'cause of action' . . . since that merely means 'legal' and not 'actual' surprise. He must show that he would be prejudiced in maintaining his . . . defense on the merits by the admission of the evidence."   *Id.* at 299 (quotation omitted).

## C. Rule 59(d) Motion for a New Trial

"The first and second sentences of Rule 59(d) grant the District Court power to order a new trial on its own accord under two circumstances: first, 'for any reason that would justify granting one on a party's motion' if the court enters its order within twenty-eight days of the entry of judgment; and second, '[a]fter giving the parties notice and an opportunity to be heard, . . . for a reason not stated in the motion.'" *Lesende v. Borrero*, 752 F.3d 324, 334 (3d Cir. 2014) (quoting Fed. R. Civ. P. 59(d)).   "A new trial may be granted 'when the verdict is contrary to the great weight of the evidence; that is where a miscarriage of justice would result if the verdict were to stand.'" *Brown v. Nutrition Mgmt. Servs. Co.*, 370 F. App'x 267, 269–70 (3d Cir. 2010) (quoting *Pryer v. C.O. 3 Slavic,* 251 F.3d 448, 453 (3d Cir. 2001)).   *See also Olefins Trading, Inc. v. Han Yang Chem Corp.*, 9 F.3d 282, 289–90 (3d Cir. 1993) ("[T]he district court's power to grant a new trial motion is limited to those circumstances where a miscarriage of justice would result if the verdict were to stand.   . . . [T]he purpose of this rule is to ensure that the trial court does not supplant the jury verdict with its own interpretation of the facts."); *Williamson v. Consol. Rail*

*Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991) ("the district court ought to grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand.").

## III.  DISCUSSION

### A.  Defendants' Rule 50 Motion for Judgment as a Matter of Law

Defendants are entitled to judgment as a matter of law because at no point in the trial was evidence introduced from which a reasonable jury could conclude that Defendants acted to deprive Plaintiff of a benefit owed under the Consulting Agreement.  Although evidence may have been introduced sufficient to establish the conduct alleged in the jury charge, the jury charge itself was defective in setting forth the elements of a cause of action for breach of the implied covenant of good faith and fair dealing.  Therefore, even granting Plaintiff all reasonable inferences, as this Court must, that Rosenthal acted in bad faith from July through December 2012, by "imploring" Plaintiff to continue working while evading his requests to clarify her position – to, in fact, rewrite the Consulting Agreement to reflect new terms she previously rejected – there was no evidence that these bad faith actions deprived Plaintiff of a benefit due to him under the Consulting Agreement — in this case, 4% of the proceeds of the sale of CIH and all its brands.

Turning first to the evidence introduced in the Plaintiff's case-in-chief, the jury heard testimony concerning Katz's request for Rosenthal to increase his "earn in" percentage under the Consulting Agreement above 4%, based on his proposal to take on additional tasks for CIH, concerning the resulting "bitter conversation" as to whether his "earn in" percentage was 2.5% or 4%, and concerning whether payment was Plaintiff's contractual right or a bonus to be decided by Rosenthal.  However, what was missing at this point in the trial was any evidence that Rosenthal had taken action to deprive Katz of the 4% owed under the Consulting Agreement.  Namely, there was no evidence that Rosenthal structured the sale to Meda AB as an asset sale in order to avoid

41

paying Katz 4% of the proceeds of sale per the terms of the Consulting Agreement.  As this Court held on Defendants' motion for summary judgment, because evidence in the record clearly supported that the understanding of the parties when the contract was executed was that Rosenthal would pursue a sale of the whole company, her then intentional pursuit of an asset sale, and any concealment of such an effort, in order to avoid paying Katz, could constitute breach of the covenant.

"Every contract in New Jersey contains an implied covenant of good faith and fair dealing."[13]  *Gotthelf v. Toyota Motor Sales, U.S.A., In.*, 525 F. App'x. 94, 106 (3d Cir. 2013) (citing *Kalogeras v. 239 Broad Ave., LLC*, 202 N.J. 349, 366 (2010)); *see also Sons of Thunder v. Borden, Inc.*, 148 N.J. 396, 420 (1997) ("[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing.").  "A party breaches the covenant if it acts in bad faith or engages in some other form of inequitable conduct in the performance of a contractual obligation." *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 288 (3d Cir. 2000) (citing *Sons of Thunder*, 148 N.J. at 423-24).  However, "[a] party does not breach the implied covenant of good faith and fair dealing merely because its decisions disadvantaged another party, and 'contract law does not require parties to behave altruistically toward each other.'" *Fabbro v. Drx Urgent Care, LLC*, 616 F. App'x. 485, 488 (3d Cir. 2015) (quoting *Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 329 (3d Cir. 2006)).  As the New Jersey Supreme Court has cautioned:

> If courts construe the covenant too broadly, it "could become an all-embracing statement of the parties' obligations under contract law, imposing unintended obligations upon parties and destroying the mutual benefits created by legally binding agreements." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 92 (3d Cir. 2000).  We have warned that "'an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent an

---

[13] As the Court noted in its previous opinion, and as argued on the instant post-trial motions, the parties have conceded that New Jersey law applies to the Consulting Agreement.  *See* 2014 U.S. Dist. LEXIS 161680 at *18-19.

improper motive.'" [*Wade v. Kessler Institute*, 172 N.J. 327, 341 (2002) (quoting *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 251 (2001)).] "'Contract law does not require parties to behave altruistically toward each other; it does not proceed on the philosophy that I am my brothers keeper.'" *Wilson*, 168 N.J. at 251 (quoting *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir.1992)). We stress that while a commercial party does not have to act with benevolence towards an opposing party, it cannot behave inequitably.

*Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 231 (2005).

Instead, "[t]he party claiming a breach of the covenant of good faith and fair dealing must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *Gotthelf*, 525 F. App'x. at 106 (quoting *Brunswick Hills*, 182 N.J. at 225). "That is, 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]'" *Kalogeras*, 202 N.J. at 366 (quoting *Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 130 (1965)); *see also Wu v. Capital One, N.A.*, 617 F. App'x. 214, 219 (3d Cir.) ("The implied covenant of good faith and fair dealing requires that parties to a contract not 'do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'") (quoting *Sons of Thunder*, 148 N.J. at 420)), *cert. denied*, __ U.S. __, 136 S. Ct. 506 (2015), *reh'g denied*, __ U.S. __, 136 S. Ct. 883 (2016).

Thus, there are two vital components of the claim at issue in this case. It is not enough for Plaintiff to merely present evidence that Defendants acted in bad faith; those alleged bad-faith actions must also have denied Plaintiff "the benefit of the bargain originally intended by the parties." *Gotthelf*, 525 F. App'x. at 106 (quotation omitted). This distinction is important in this matter and was omitted from the jury charge.

43

It was not enough for Plaintiff to prove simply that Rosenthal acted in "bad faith" in her discussions of the Consulting Agreement.  Indeed, if that alone were sufficient to state a claim for breach of the implied covenant, the jury's verdict in this case would certainly have to stand.  During Plaintiff's case-in-chief, the jury heard evidence from which it could have concluded that Rosenthal pretended not to know the parties had a contract, and, after being confronted with a signed copy of the Consulting Agreement and its addendum, promised to review it with her attorney and get back to Katz, but never did.  2T68-10 to 69:1; Ex.'s 62, 63.  This evidence was sufficient for a reasonable jury to reach the conclusion that Rosenthal's actions constituted bad faith.

However, what was missing in Plaintiff's case was evidence that Rosenthal's actions deprived Katz of the benefits due to him under the Consulting Agreement, a necessary element of Plaintiff's claim.  *See Gotthelf*, 525 F. App'x. at 106 (quotation omitted).  Importantly, as addressed at length in the Court's discussion of promissory estoppel below, at no point in the trial did Plaintiff claim that Rosenthal merely should have paid Katz an "extraordinary payout," words that she used to encourage Katz to continue to work for CIH and not leave her "in the lurch."  *See* Ex. 62 at IK 00792942.   Instead, Plaintiff's claim was that Rosenthal, acting in bad faith, denied Plaintiff *the benefits of the Consulting Agreement*.  The jury charge provided that Rosenthal was alleged to have injured Plaintiff by "purposefully failing to inform Plaintiff that he was not entitled to 4 percent of the Proceeds of Sale under the Consulting Agreement due to the structure of the sale transaction."   The language of the charge implied that if the jury found Defendants had engaged in such conduct, then the implied covenant would have been breached.

The jury cannot be faulted for finding in favor of Plaintiff, despite the inadequacy of the evidence, because the jury charge misleadingly made it appear that, by Rosenthal *not informing*

*Katz* that he would not receive 4% of the proceeds of an asset sale under the terms of the Consulting Agreement, which only entitled Plaintiff to 4% of the sale of the company *and* its brands, and by Rosenthal *not informing Katz* that the Meda AB transaction would be structured as an asset sale of the MidNite brand alone, Defendants could be liable for breach of the implied covenant. Defendants' failure to inform Katz of his benefits under the contract, however, had no effect on his entitlement to those benefits. The structure of the transaction determined whether Plaintiff would enjoy the fruits of the contract, and Plaintiff failed to introduce evidence that Defendants acted in bad faith in structuring the sale to Meda AB.

As other courts have recognized, relying, like New Jersey, on the Restatement (Second of Contracts) § 205, "[t]he scope of an implied covenant of good faith depends on the 'fruits' of the contract." *Prudential Ins. Co. v. Diem*er, 637 F. Supp. 313, 315 (N.D. Ind. 1986) (citations omitted), *aff'd*, 810 F.2d 1167 (7th Cir. 1987); *see Ayash v. Dana-Farber Cancer Inst.*, 822 N.E.2d 667, 684 (Mass.), *cert. denied sub nom.*, *Globe Newspaper Co. v. Ayash*, 546 U.S. 927 (2005); *see also Colony Ins. Co. v. Human Ensemble, LLC*, 299 P.3d 1149, 1155-56 (Utah Ct. App. 2013); *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 888-89 (Del. Ch. 2009). "The concept of good faith is shaped by the nature of the contractual relationship from which the implied covenant derives, and the scope of the covenant is only as broad as the contract that governs the particular relationship." *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 238 (1st Cir. 2013) (citations and internal quotation marks omitted). "As a consequence, the implied covenant cannot create rights and duties not otherwise provided for in the existing contractual relationship, and instead focuses on the manner of performance." *Id.* (citations and internal quotation marks omitted); *see also Uno Rests., Inc. v. Boston Kenmore Realty Corp.*, 805 N.E.2d 957, 964 (Mass. 2004) (citations omitted). This limitation on the scope of the implied covenant of good faith and fair dealing is what makes

this case distinguishable from other cases in which New Jersey courts have upheld such claims where the defendant's bad faith conduct deprived the plaintiffs of the fruits of their agreements.

For example, in *Bak-A-Lum Corp. v. Alcoa Building Products, Inc.*, 69 N.J. 123 (1976), the plaintiff made an oral agreement with the defendant which gave the plaintiff an exclusive distributorship of aluminum siding and related products manufactured by the defendant. *Id.* at 126. While the defendant intended to terminate the "exclusive" distributorship by appointing four additional distributors, it also encouraged the plaintiff to expand its warehouse facilities, which the plaintiff did by signing a five-year lease, substantially increasing its operating costs. *Id.* at 127, 129-30. The New Jersey Supreme Court held that the defendant breached the implied covenant of good faith and fair dealing. As the Court explained:

> While the contractual relation of manufacturer and exclusive territorial distributor continued between the parties an obligation of reciprocal good-faith dealing similarly persisted between them. In such circumstances defendant's selfish withholding from plaintiff of its intention seriously to impair its distributorship although knowing plaintiff was embarking on an investment substantially predicated upon its continuation constituted a breach of the implied covenant of dealing in good faith of which we have spoken.

*Id.* at 130. The "benefit" of that agreement was plaintiff's ability to use of the new warehouse to exclusively distribute the defendant's products for a reasonable period of time (*i.e.*, the oral exclusive distributorship agreement could only be terminated upon reasonable notice). *See id.* at 129 ("Our review of the record leads us to concur in the trial court's holding that there was a valid distributorship agreement terminable only on reasonable notice.") Accordingly, although the New Jersey Supreme Court rejected that the measure of the damages "should encompass the remaining 4 1/2 years of the [warehouse] lease as of the date of breach," it exercised its original fact finding jurisdiction to hold that "a reasonable period of notice of termination of the distributorship, under all the circumstances, would have been 20 months." *Id.*

In *Sons of Thunder*, the plaintiff entered into a contract with the defendant for the sale of shellfish stock.  Under the contract, the plaintiff purchased and rigged a "shuck-at-sea" vessel and agreed to sell all of its shellfish stock to defendant at a set price.  The defendant agreed to buy a specified quantity of shellfish stock from the plaintiff, which would provide the plaintiff with an income stream from which to repay the loans it took out to pay for the purchase and rigging of the vessel. *Id.* at 402-03.  The defendants assisted the plaintiff in obtaining these large loans by assuring the bank that they had a very solid and ongoing business relationship. *Id.*  However, when the defendant's management changed, the new management team expressed its intention not to honor the contract, sent the plaintiff's vessel out only in bad weather, and began to purchase less shellfish from the plaintiff than the contract required, despite knowing that the plaintiff required the income from the defendant to pay back the loans for the vessel. *Id.* at 405-06.  Ultimately, the defendant notified the plaintiff that it was terminating the contract in compliance with the time limitations under the contract. *Id.* at 397.

The New Jersey Supreme Court agreed with the Appellate Division that the implied covenant of good faith and fair dealing could not override an express termination provision, but in reversing the Appellate Division's decision, it held that that the exercise of a termination provision was not the question at issue in the case:

> We agree with the majority's view that the implied covenant of good faith and fair dealing cannot override an express termination clause. That statement of the law does not, however, provide dispositive guidance in this appeal because we must determine whether [the defendant] *performed* its obligations in good faith.

*Id.* at 419.  The court concluded that a jury reasonably could have found that the defendant had breached its duty of good faith, not by terminating the agreement, but based on the defendant's conduct preceding the cancellation of the agreement by, among other things, its refusal to buy the required amount of shellfish, only sending the plaintiff's vessel out in bad weather, and, despite

47

knowing the financial straits of the plaintiff, pressuring it to obtain additional financing. *Id.* at 424-25. These bad faith actions by the defendant "destroyed [plaintiff's] reasonable expectation and right to receive the fruits of the contract," *id.* at 425, which Judge Humphreys, writing in dissent in the appellate division, recognized as including "[p]ermitting [the plaintiff] to earn enough money under this contract to at least pay off the debts he incurred in making the Shuck-at-Sea project a success," which was "the nub of this joint undertaking." *Sons of Thunder, Inc. v. Borden, Inc.*, 285 N.J. Super. 27, 94-95 (App. Div. 1995) (Humphreys, J. dissenting).

Finally, in *Brunswick Hills*, the plaintiff, a tenant, wished to exercise an option to purchase a ninety-nine-year lease from the defendant – a benefit of the lease agreement. 182 N.J. at 214. Nineteen months before the deadline to exercise the option expired, the plaintiff notified the defendant of its intent to exercise its option to purchase the ninety-nine-year lease, but, under the mistaken belief that the purchase price was not due until the time of closing, the plaintiff did not tender the purchase price to the defendant at that time. *Id.* at 229. As a result, execution of the option remained unperfected. *Id.* During the following time period, because it was not in the defendant's economic interest to allow the plaintiff to exercise its option, the defendant "engaged in a pattern of evasion, sidestepping every request by plaintiff to discuss the option and ignoring plaintiff's repeated written and verbal entreaties to move forward on closing the ninety-nine-year lease." *Id.* at 229-30. These requests to move forward with the option occurred prior to the deadline to exercise the option, and yet, the defendant did not disabuse plaintiff of the notion that it had properly exercised the option, although the purchase price was not tendered. It was only after the option period expired that defendant informed the plaintiff that it was too late. The Supreme Court of New Jersey held that the defendant had breached the covenant of good faith and

fair dealing through "a demonstrable course of conduct [consisting of] a series of evasions and delays, that lulled plaintiff into believing it had exercised the lease option properly." *Id.* at 231.

In each of the foregoing cases, the bad faith conduct on the part of the defendants had the result of preventing the plaintiffs from obtaining a benefit of the bargain between the parties. In *Bak-A-Lum*, the plaintiff could not exclusively distribute the defendant's products from its new warehouse facilities for a reasonable period of time. In *Sons of Thunder*, the plaintiff could not realize a profit or pay off the loans that it incurred to fund the joint enterprise. In *Brunswick Hills*, the plaintiff could not exercise its option for a ninety-nine year lease, but could have done so had the defendant not evaded its attempts to perfect its option. The appropriate analog in this case would be if Defendants took action to deprive Plaintiff of the 4% of the proceeds of sale of CIH and all of its brands to which Plaintiff was entitled under the Consulting Agreement, for example, by purposefully crafting the sale as an asset transaction. It was undisputed between the parties that Rosenthal's intention was always to sell the entire company, and Plaintiff introduced evidence suggesting that the parties understood this to be her intention in crafting their agreement. If, for example, Rosenthal had found a buyer for CIH and all of its brands, but intentionally renegotiated with the buyer to structure the sale as a sale only of certain of CIH's assets rather than of the whole company in order to avoid paying Katz under the Consulting Agreement, Rosenthal could be said to have deprived Katz of the benefit of their bargain. In contrast, once the structuring issue was removed from the case, Rosenthal's potential dissembling and evasions about the asset sale alone could not destroy Plaintiff's contractual right; the right to 4% of the proceeds of sale of the whole company simply was not implicated in the Meda AB transaction because it was an asset sale.

Looking to the specific facts introduced at trial, when Katz raised the issue of sharing in the sale of the MidNite brand in 2007, Rosenthal rejected including that in the parties' bargain.

*See* Ex.'s 2, 5; 1T24:2-22; 1T25:20-26; 2T135:9 to 136:16.   When Katz raised the issue again in July 2012, Rosenthal feigned ignorance of the Consulting Agreement (which indisputably did not contain such a benefit), asked for time to speak to her attorney, and stated that Katz would be paid an unspecified amount as a "bonus," that was never forthcoming.  Ex.'s 62, 63.  Although those actions may constitute bad faith conduct on the part of Rosenthal, they did not cause Plaintiff to lose the ability to exercise a contractual right due to him under the Consulting Agreement, like the option in *Brunswick Hills*, or to realize a reasonably expected profit, like in *Bak-A-Lum* or *Sons of Thunder*.  At best, Katz lost only the opportunity to either force Rosenthal to change the terms of the Consulting Agreement or "crater" the deal for Rosenthal by exercising the termination provision under the Consulting Agreement and refusing (after the 30-day period expired) to help carve out the sales information for the MidNite brand.  Pl. Opp. Br. at 8; 2T82:13 to 83:9.  Indeed, Katz testified he continued to work for CIH, and did not resign, because he "wanted to see how this played out," 2T79:1-3, because, he "*felt with some changes that we were considering at the time*, that why walk out at this point when there is still the opportunity short-term to reap the rewards of all the time [he] had put into it."  2T82:13-20 (emphasis added).

As such, at the close of Plaintiff's case-in-chief, granting all reasonable inferences to Plaintiff, a reasonable jury could not have concluded that Defendants' failure to inform Plaintiff about the consequences of the Meda AB sale, and his lack of a contractual right to share in the proceeds, constituted a breach of the implied covenant of good faith and fair dealing, because those actions had no effect on Plaintiff's entitlement under the Consulting Agreement to share in 4% of the proceeds of sale of CIH and all of its brands.  Nonetheless, mindful of the considerations of justice and judicial efficiency discussed by the Supreme Court in *Unitherm* favoring the allowance of matters to proceed to a jury verdict, this Court reserved decision on Defendants' Rule 50(a)

motion at the close of Plaintiff's evidence and allowed the trial to proceed.  When, however, in response Defendants' Rule 50(a) motion, Plaintiff abandoned its claim that Defendants structured the Meda AB transaction to deprive Plaintiff of a benefit under the Consulting Agreement — the only basis for an implied covenant claim that this Court identified in its summary judgment opinion as available to Plaintiff — the Court should have granted Defendants' Rule 50(a) motion and ended the case.  Without even the promise that Plaintiff would attempt to prove that Defendants had taken some action to actively deprive Plaintiff of a contractual right, rather than simply to discuss such rights in bad faith, there was no longer a possibility that Plaintiff could prevail on its claim for breach of the implied covenant of good faith and fair dealing.

Predictably, therefore, after the Court allowed the trial to go forward, no evidence was adduced during Defendants' case to support Plaintiff's deprivation of any entitlement under the Consulting Agreement.  To be sure, the jury heard evidence during Defendants' case that would further enable a reasonable jury to conclude the Rosenthal acted in bad faith, such as the fact that it was only *after* the sale of the MidNite brand that she threw up her hands and decided not to pay Katz any of the proceeds of the sale.  3T219:1 to 221:12; Ex. 94.  The jury also heard testimony from Rosenthal adverse to Plaintiff's claim as it would be charged.  For example, there was evidence that corroborated that Katz had requested that the definition of "Proceeds of Sale" be changed to include the situation that occurred in the sale to Meda AB, and that Rosenthal rejected it.  *Compare* 3T107:18 to 108:22; 3T109:23 to 110:22, *with* See Ex.'s 2, 5; 1T24:2-22; 1T25:20-26; 2T135:9 to 136:16.  The jury also heard testimony from Rosenthal that she made Katz aware, as Katz testified, that an asset sale, and not a stock sale, was imminent.  *Compare* 3T184:18 to 185:13; 3T188:7 to 191:16; 4T21:24 to 22:19, *with* 2T85:20 to 87:21.  However, none of these facts are dispositive of the core legal question of Plaintiff's breach of implied covenant claim.  That

question, whether Defendants had taken action to deprive Plaintiff of the 4% of the proceeds of sale of CIH and all of its brands to which Plaintiff was entitled under the Consulting Agreement, was never submitted to the jury because Plaintiff withdrew its structuring theory in response to Defendants' Rule 50(a) motion at the close of Plaintiff's case.

Importantly, the jury, however erroneously charged, did not find that Katz was entitled to 4% of the proceeds of sale of the MidNite brand, since the verdict returned represented only 2.95% of the proceeds of sale — a percentage appearing nowhere in the Consulting Agreement and argued by none of the parties. This fact is particularly telling, since it demonstrates that the jury did not award Plaintiff the fruits or benefits of the contract, but instead awarded him a "large payout" that was not part of the Consulting Agreement.

In essence, Plaintiff's case at trial morphed from a claim for breach of the covenant of good faith and fair dealing implicit in the Consulting Agreement into a claim that the parties had entered into a separate, unwritten modification of the Consulting Agreement; that the "modification," which incorporated terms Katz originally wished to include in the Consulting Agreement, now became a part of that contract based on Katz's assertion that it was part of the Agreement; and that Rosenthal failed to adequately disabuse Katz of that notion and responded only with vague references to trusting one another, being fair, and that a large payout would be forthcoming to "people" who were loyal. The Court does not address whether these allegations might have supported a claim for the existence — and breach — of an oral modification of the Consulting Agreement, because it is clear that such a claim was not pleaded by Plaintiff, nor was such claim presented to the jury. Instead, the "fruit" or "benefit" of the Consulting Agreement to Katz was clearly, as the Court held in its summary judgment opinion, 4% of the proceeds of the sale of the company and all its brands, not 4% of the proceeds of the sale of the MidNite brand.

52

In short, now considering Defendants' timely renewed motion for judgment as a matter of law under Rule 50(b), it is clear that the evidence at trial could not support a finding that Defendants deprived Plaintiff of the fruits of the Consulting Agreement because (1) in Plaintiff's case-in-chief Plaintiff failed to introduce any evidence that Defendants took action to deprive Plaintiff of 4% of the proceeds of a sale of CIH and all of its brands; (2) Plaintiff then waived any argument that Defendants acted in bad faith to deprive Plaintiff of such a benefit by structuring the Meda AB transaction as an asset sale; and (3) after the waiver, in Defendants' case-in-chief, no evidence was admitted that Defendants took action to deprive Plaintiff of 4% of the proceeds of a sale of CIH and all of its brands.  The Court should have granted Defendants' Rule 50(a) motion. Moreover, because of the defective jury charge, the jury was never charged with the core element of Plaintiff's breach of the implied covenant claim, and thus its verdict cannot stand.  Accordingly, granting every favorable inference to Plaintiff, a reasonable jury that had properly been charged could not have returned a verdict in its favor.  For the same reasons, any new trial on Plaintiff's breach of implied covenant claim would be futile.

Accordingly, Defendants' motion for a judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50, is GRANTED.

### B.    Plaintiff's Rule 15(b)(2) Motion to Conform the Pleadings to the Evidence

Having determined that Defendants are entitled to judgment as a matter of law on Plaintiff's claim for violation of the covenant of good faith and fair dealing, the Court next considers whether it might nevertheless affirm the jury's verdict or order a new trial on the basis of a different legal theory by conforming the pleadings to the evidence admitted at trial, pursuant to Fed. R. Civ. P. 15(b)(2). As the Court observed above, despite the fact that Plaintiff proceeded to trial only on a claim for breach of the covenant of good faith and fair dealing implicit in the

Consulting Agreement, the evidence Plaintiff elicited at trial often supported the different claim that Defendant promised Plaintiff a "bonus" independent of the Consulting Agreement. Accordingly, in its supplementary briefing, Plaintiff contends that even if the verdict in its favor on the implied covenant of good faith and fair dealing is not supported by sufficient evidence, the final judgment may be upheld by conforming the pleadings to a claim for promissory estoppel, which the evidence admitted at trial did sufficiently support.  Alternatively, Plaintiff contends that after conforming the pleadings, the Court may grant a new trial on the promissory estoppel claim. In opposition, Defendants contend that the judgment in favor of Plaintiff cannot be affirmed and a new trial cannot be granted under a theory of promissory estoppel because Defendants did not consent to litigate that claim at trial.

As a post-judgment inquiry, only the second application of Rule 15(b)(2), which "allows for the amendment of a complaint to conform to the evidence offered at trial, as long as the parties consent either expressly or impliedly," is applicable in this case. *Addie*, 737 F.3d at 867.  Given Defendants' continued opposition and consistent assertion that the Court's decisions on the motions to dismiss and for summary judgment foreclosed Plaintiff's proposed causes of action at trial, it is clear that Defendants never expressly consented to try a promissory estoppel claim to the jury.  Accordingly, Defendants' consent, if any, must be implied from the parties' conduct at trial. As set forth above, to determine whether a party has impliedly consented to the amendment of a pleading, courts look to: (1) whether the parties recognized that the unpleaded issue entered the case at trial, (2) whether the evidence that supports the unpleaded issue was introduced at trial without objection, and (3) whether a finding of trial by consent prejudiced the opposing party's opportunity to respond. *Id.* (quoting *Douglas,* 50 F.3d at 1236).

Here, it is clear that evidence supporting a promissory estoppel claim was introduced at trial without objection. *See, e.g.*, 3T35:12-16 ("Q: So you [Rosenthal] are saying even if there wasn't a deal that met what you say the agreement calls for, you were going to pay Mr. Katz anyway? A: That was my thinking subject to some of the other things that I said."); 3T50:16-18 ("my [Rosenthal's] intention was to give Mr. Katz a very generous bonus, but that was a discretionary bonus. That wasn't dictated by the terms of the contract."); 3T189:23-25 ("I [Rosenthal] remember conversations where, . . . I said, Well, you know, I will definitely want to pay you [Katz] a bonus."); 3T190:13-19 ("I [Rosenthal] told him [Katz] that . . . I don't think that this sale of MidNite falls within what is covered by the contract, but that I plan to give him a bonus."); 3T191:15-16 ("He would get a bonus upon the sale of an asset because it would not be covered by the contract."); 3T206:14-15 ("The bonus was not dictated at all by the consulting agreement.").  Moreover, the parties do not dispute that the same evidence adduced in support of Plaintiff's covenant of good faith and fair dealing claim at trial would also be relevant to Plaintiff's proposed promissory estoppel claim. Plaintiff's Supplementary Brief at 10 ("Katz's implied covenant case . . . relied upon the pattern of Rosenthal's behavior going back to the beginning of their relationship in 2007. . . . The same proofs establish promissory and equitable estoppel over that time span, making a new trial unnecessary and duplicative on these facts."); Defendants' Supplementary Reply Brief at 11 ("evidence relevant to any promissory estoppel claim was also relevant to the covenant of good faith and fair dealing claim").

Despite the presence of evidence relevant to a promissory estoppel claim, the record does not support that the parties recognized that the unpleaded issue of promissory estoppel had entered the trial.  Normally a plaintiff's awareness of the presence of a new, unpleaded claim at trial is readily established, because the introduction of the claim was presumably part of Plaintiff's

litigation strategy and was intended by the Plaintiff to be tried.  The procedural posture of this case

is somewhat unique because Plaintiff's post-trial Rule 15(b) motion came, not on Plaintiff's own

initiative or even in response to Defendants' Rule 50(b) motion, but only in response to the Court's

inquiry about the Court's capacity to grant a new trial to Plaintiff under Rule 59 in the event that

Defendants' Rule 50 motion should be granted.  As such, the Court must first evaluate whether

Plaintiff itself recognized that a new claim was being tried *during the trial* or whether Plaintiff's

Rule 15 motion is merely a legal construct after the fact.

   The record suggests that Plaintiff did not intend to try a promissory estoppel claim on the

basis of the discretionary bonus promised by Rosenthal in 2012, the only basis for a promissory

estoppel claim for which evidence was admitted at trial.  As an initial matter, the Court observes

that Plaintiff did plead a promissory estoppel claim in its Original Complaint.  The Court dismissed

that claim at the hearing held on September 12, 2013.  In the dismissed claim, Plaintiff sought to

estop Defendants from reneging on Rosenthal's alleged promise to give Katz "a reasonable

percentage of the proceeds of sale" of CIH's brands MidNite and/or Nature Remedy.  Compl. ¶

61.  The "promise" upon which that promissory estoppel claim was based was clearly Rosenthal's

alleged promise to pay Katz either 2.5% or 4% of the "proceeds of sale," a term defined in the

Consulting Agreement and discussed by the parties as early as 2007.  *See, e.g.*, Compl. ¶¶ 24; 26;

31.  By contrast, the promissory estoppel claim for which evidence was introduced at trial was

based on Rosenthal's 2012 promise of a discretionary "bonus" to Katz in order to induce him not

to leave CIH and to undertake additional long hours of work to help facilitate the Meda transaction.

The Original Complaint clearly differentiated between the 2007 (and allegedly repeated thereafter)

promise for the proceeds of sale and the 2012 promise of a "bonus."  Plaintiff alleged that

"Concepts would give Katz a 'bonus' when the company was sold."  Compl. ¶ 25.  However,

Plaintiff specifically did not include that allegation in its promissory estoppel claim.  *Id.* at ¶ 58 (re-alleging and incorporating into Plaintiff's promissory estoppel claim ¶¶ 3-6, 15, 20-23, and 28-29, but not ¶ 25).  Accordingly, although the Court did dismiss the promissory estoppel claim pleaded in the Original Complaint, the Court's decision did not impact any claim based upon the allegedly promised "bonus" in 2012.  Such a claim was never pleaded by Plaintiff.

Having determined that a promissory estoppel claim based on the "bonus" was not pleaded, I now proceed to the question of whether Plaintiff intended such a claim to enter, or recognized that such a claim had entered, the trial.  Plaintiff's conduct suggests that it did not.  Firstly, after the close of the evidence and before the case was submitted to the jury, Plaintiff did not move to charge the jury on a promissory estoppel claim.  If Plaintiff believed promissory estoppel to have been tried to the jury and supported by the evidence, it almost certainly would have asked that the jury be charged accordingly.  Secondly, Plaintiff's counsel did not argue any cause of action based upon the "bonus" offered in 2012 in his summation.  In closing, Plaintiff's position remained that the only cause of action before the jury was one based upon the contract between the parties.  4BT136:16-21 ("This case involves a higher, different obligation between contract parties"); 4BT137:3-8 ("You are going to spend some time looking at the instructions which Judge Wolfson has read to you, but as they apply here they prohibit a party in a circumstance such as this from acting with bad motives or intentions or engaging in deception or evasion in the performance of a contract. That's this case.").  Plaintiff further argued that mentions of the word "bonus" in evidence referred to Rosenthal's promise of compensation under the contract. 4BT147:8-18 ("And that is how Ms. Rosenthal described the relationship, the arrangement to Brynwood, when she went out in 2009 and tried to sell the company. She said: 'The contract with Mr. Katz calls for a bonus paid to him by Holly Rosenthal upon a sale of the business.' And, yes, the term 'bonus' is used there.

That's another way of describing Mr. Katz's 4 percent. Call it a bonus, but this is a bonus fixed by contract, not discretion on the part of Ms. Rosenthal."); 4BT151:1-20 (promise of "an unbelievably generous bonus" followed by request for an addendum only makes sense if obligation arises under the contract).

Finally, Plaintiff did not argue a promissory estoppel theory or move to conform the pleadings under Rule 15(b) in opposition to Defendants' Rule 50(a) motion at trial or Rule 50(b) motion after the jury's verdict.  Instead, at oral argument on the Rule 50(a) motion, Plaintiff's counsel made clear that Plaintiff's claim was based upon Rosenthal's promise of 4% of the proceeds of sale in the Consulting Agreement and her later allegedly evasive and deceptive actions to deprive Katz of that benefit.  3T78:25-79:14 ("The issue is the evasion and deception Ms. Rosenthal engaged in beginning in at least in July 2012 when confronted with the written agreements that she denied signing initially showing that he's entitled to 4 percent. She had somehow gotten in her mind he was entitled to 2.5 percent, and the idea of 30 or $40 million paying Mr. Katz 4 percent was apparently abhorrent to her, and she refused to acknowledge that, and she denied the existence of the agreements, and then engaged in a pattern of evasion and deception by failing to make her position known, and that fits precisely within the rubric of the covenant of good faith as articulated by our Supreme Court in numerous cases -- Sons of Thunder being one, Brunswick Hills Racket Club being another.").  Moreover, in opposition to the Rule 50(b) motion, Plaintiff made clear that its theory of the case relied upon Defendants' pre-2012 conduct in addition to subsequent events.  Plaintiff's Rule 50(b) Opposition Brief, 1 ("Katz's case hardly rests solely upon Rosenthal's deceptive and evasive conduct in mid-2012, as CIH's brief posits, but rather relies upon the pattern of her behavior going back to the beginning of their relationship in 2007.").  Either of Defendants' Rule 50 motions would have provided a perfect opportunity for Plaintiff to

raise the existence of the promissory estoppel claim, if the claim had in fact been tried. Plaintiff's failure to do so strongly suggests that Plaintiff did not recognize that the issue had entered the trial.

Although the foregoing discussion of Plaintiff's perspective alone would be sufficient to deny its Rule 15 motion, courts traditionally evaluate the second factor of the implied consent analysis from the perspective of the defendant, and this Court will also do so, as an alternative and sufficient basis for the denial of the motion. As a threshold matter, Defendants contend that they legally could not have had notice that a promissory estoppel claim was being tried to the jury because the Court dismissed the promissory estoppel claim pleaded in Plaintiff's Original Complaint. As the Court has already explained, the promissory estoppel claim pleaded in the Original Complaint was based on an entirely different set of facts than that which emerged at trial. Accordingly, it would not have been reasonable for Defendants to rely on the Court's dismissal of Plaintiff's earlier claim to avoid taking notice of evidence admitted at trial relevant to a promissory estoppel claim based on the alleged promise of a "bonus" outside of the Consulting Agreement.

Still, the second factor of the implied consent analysis weighs against granting Plaintiff's 15(b)(2) motion because of the Third Circuit's well-established rule that "'an issue has not been tried by implied consent if evidence relevant to the new claim is also relevant to the claim originally pled, because the defendant does not have any notice that the implied claim was being tried.'" *Addie*, 737 F.3d at 867 (quoting *Douglas,* 50 F.3d at 1236). *See also Foraker v. Chaffinch*, 501 F.3d 231, 246 (3d Cir. 2007) (same). The e-mail communications and conversations admitted into evidence, which would have supported a claim for promissory estoppel were the same communications and conversations upon which Plaintiff relied to establish breach of the covenant of good faith and fair dealing. In them, the parties discussed not only the potential for a

discretionary bonus, but also the structure of the MidNite sale transaction and the sales percentage to which Plaintiff may or may not have been entitled under the Consulting Agreement.

For example, "[u]nder New Jersey law, to recover on a theory of promissory estoppel, a plaintiff must allege and prove that: (1) there was a clear and definite promise; (2) the promise was made with the expectation that the promisee would rely upon it; (3) the promisee reasonably did rely on the promise; and (4) [the promisee] incurred a detriment in said reliance." *Del Sontro v. Cendant Corp.*, 223 F. Supp. 2d 563, 574 (D.N.J. 2002). By contrast, "[a] plaintiff may be entitled to relief in an action under the covenant [of good faith and fair dealing] if the defendant acts with ill motives and without any legitimate purpose to destroy the plaintiff's reasonable expectations [under the contract]." *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 518 (D.N.J. 2009), *aff'd*, 374 F. App'x 341 (3d Cir. 2010). At trial, in support of its breach of the implied covenant of good faith and fair dealing claim, Plaintiff introduced evidence of a July 9, 2012 telephone conversation between Rosenthal and Katz concerning Katz's compensation. In cross-examining Rosenthal about the conversation, Plaintiff's counsel sought to establish Defendant's reasonable expectation under the contract to a particular percentage of the proceeds of any sale, and elicited the following testimony:

> The other thing that came up was, Mr. Katz was asking about payment under the contract, and we got into a, I guess, a sidebar conversation because his understanding was that if it was the deal that it would be -- if it was a deal as covered by the contract, that it would be 4 percent. And I said it was my recollection that we had discussed and agreed that when he got an increased compensation, the percentage that he would get upon a sale, we agreed would be lowered to 2.5 percent from 4 percent

3T190:22-191:1-2. In providing context for her testimony concerning the contract, however, Rosenthal went on to testify about her potential promise separate and apart from the Consulting Agreement. "That really wasn't relevant anyway, I told him, because we were talking about a bonus now because we were selling an asset rather than selling the company. . . . He would get a

60

bonus upon the sale of an asset because it would not be covered by the contract."  3T191:8-11. While in the trial on breach of the covenant of good faith and fair dealing, this testimony was relevant to Defendant Rosenthal's motive in denying Plaintiff payment under the contract, and to the reasonableness of Katz's continued expectation of payment under the contract, the testimony would also bear directly on the existence of a promised bonus in any promissory estoppel action. In other words, the same evidence was relevant both to the tried and proposed new claim.

In the same vein, Plaintiff introduced Trial Exhibit 62, including, *inter alia*, a July 11, 2012 e-mail from Rosenthal to Katz in which Rosenthal responded to Katz's statement that he would not proceed with some or all of his work until his entitlement to compensation from any sale was clarified.  In the email, Rosenthal wrote: "My feeling is the least you can do is not leave me in the lurch. Like I said in the previous email, an extraordinary payout is consistent with someone who is loyal and puts the interests of the business first from start to finish." *Id.*  At trial, Plaintiff sought to use this e-mail to establish Rosenthal's bad faith in attempting to conceal from Katz that the Meda sale would deprive him of compensation allegedly promised under the Consulting Agreement. 4BT152:19-153:6.  In any promissory estoppel action, however, Plaintiff would need to rely on the same e-mail to establish the promise of a bonus to Katz to induce him to remain with CIH to his detriment.  *See* Plaintiff's Supplementary Brief at 6-7 (stating that the July 11, 2012 e-mail was one of the communications conveying a "clear and definite" promise to pay Katz sufficient to establish a claim of promissory estoppel).  Accordingly, the core "evidence relevant to the new claim [of promissory estoppel] is also relevant to the claim originally pled," providing the Defendants with insufficient notice for the new claim to have been tried with the Defendants' implied consent. *Addie*, 737 F.3d at 867 (quoting *Douglas,* 50 F.3d at 1236).

Turning to the final factor, it is certain that Defendants would be prejudiced by a finding that a promissory estoppel claim was tried by implied consent.  The record is clear that Plaintiff did not intend to try the issue to the jury, Defendants, as a matter of law had no notice that the matter was being tried, and the possibility of a Rule 15(b) motion was not raised until after the Court had requested supplementary briefing on the separate issue of relief under Rule 59.  The Third Circuit has long held that the absence of notice combined with delay prejudices the defendant, even where the plaintiff has raised a Rule 15 motion before the final entry of judgment. *Douglas*, 50 F.3d at 1236 ("it is obvious that [defendant] was severely prejudiced at such a late stage in the proceedings when the district court effectively permitted [plaintiff] to amend the pleadings and allowed the jury to consider another theory of liability against [defendant] without [defendant] having had the opportunity to defend against this new claim").  *See also Swiatek*, 542 Fed. Appx. At 188 (absence of notice to defendant required denial of Rule 15(b) motion, and prejudice obvious because if defendant had realized the claim was being tried "it would have prepared for and proceeded at trial much differently"); *Addie*, 737 F.3d at 867 (affirming denial of Rule 15(b) motion, without separate discussion of prejudice, where same evidence supported new claim and claims actually tried); *Foraker*, 501 F.3d at 246 (same).  Although the Third Circuit has yet to comment on the application of Rule 15(b)(2) in a case such as this, in which a plaintiff seeks to change the pleaded cause of action after the entry of a jury verdict, all of the other federal appellate courts that have considered the issue have found that such post-judgment amendments are particularly prejudicial.[14]

---

[14] *See Dunne v. Libbra*, 448 F.3d 1024, 1029–30 (8th Cir. 2006) (affirming the district court's denial of plaintiff's Rule 15(b) motion where plaintiff sought to amend its theory of recovery after the jury verdict, when defendant would have no opportunity to present contradicting evidence, and decrying plaintiff's motion as an "attempt at trial of this issue by ambush"); *Deere & Co. v. Johnson*, 271 F.3d 613, 623 (5th Cir. 2001) (because plaintiff had made no attempt to

This Court also finds persuasive the reasoning of the Seventh Circuit that Rule 15(b) may not be used to disturb judgments in favor of defendants and grant new trials to plaintiffs on new legal theories, due to the inherent prejudice to defendants and the tendency to undermine the finality of judgments. In *Cleary v. Indiana Beach, Inc.*, 275 F.2d 543 (7th Cir. 1960), the plaintiff's "complaint sounded on negligence," "[t]he case was tried, submitted to the jury, and, by the jury considered on the theory of negligence." *Id.* at 546. The jury found in favor of the defendant and, after the jury verdict, plaintiff filed a Rule 15(b) motion to conform the pleadings to the evidence at trial and allow the plaintiff to amend his complaint in a new trial to allege that the defendant had been guilty of willful and wanton misconduct. *Id.* The district court denied the plaintiff's motion. The Seventh Circuit affirmed the district court, holding:

> We think it indisputable that the action of the trial judge in denying the motion to amend is unassailable. If Rule 15(b) were applied in the manner in which it is here sought to be used, litigation might never end. We think it obvious that the Rule was not intended to permit a party to amend his pleadings after verdict and, thereby upset the verdict by asserting a new theory which was not included in the original pleadings, and upon which the case was not tried.
> We have previously approved the principle that Rule 15(b) cannot be used in the above fashion. . . .
> Plaintiffs would shift their ground and try a new theory of recovery. The effect of the amendment they propose would be not to conform the pleadings to a judgment they have won, but to jeopardize and perhaps to overthrow a judgment they have lost. It is a prime purpose of (15(b)) to avoid the necessity of new trials because of procedural irregularities,

---

amend the jury verdict form to include the new claim and defendant would be deprived of the opportunity to present contradictory evidence relevant to the new claim, "amending the pleadings—after the close of evidence and after the return of the verdict—violated [defendant's] right to procedural due process, and thus the district court abused its discretion by allowing an amendment under Rule 15(b)."); *Freeman v. Chicago Park Dist.*, 189 F.3d 613, 618 (7th Cir. 1999) (contract claim not tried with consent of the defendant where Plaintiff tried to "capitalize on the jury's verdict" by conforming evidence to new cause of action for breach of contract claim not submitted to the jury at trial); *Brown v. Cooper Clinic, P.A.*, 734 F.2d 1298, 1301 (8th Cir. 1984) (The purpose of . . . rule [15(b)] is to bring the pleadings in line with the actual issues upon which the case was tried[.] However, an amendment after judgment is not permissible which . . . changes the theory on which the case was actually tried, even though there is some evidence in the record introduced as relevant to some other issue which would support the amendment.") (quotations omitted).

> not to set judgments aside and make new trials necessary. If this latter application of the Rule were permitted, a losing party, by motions to amend and rehear, could keep a case in court indefinitely, trying one theory of recovery or defense after another, in the hope of finally hitting upon a successful one.

*Id.* at 547 (quotations omitted). In short, the circuit court found that Rule 15(b) was not a vehicle by which a plaintiff could obtain a new trial on a completely new theory of its case after having lost on its initial theory of choice. The procedural posture of *Cleary* was different from that in this case because the jury in *Cleary* had entered a verdict in favor of defendant. Although here, the jury found in favor of Plaintiff on its implied covenant of good faith and fair dealing claim, the holding of *Clearly* is no less applicable because, as I have found here, Defendants are entitled to judgment as a matter of law on the implied covenant claim tried. Accordingly, the same reasoning applies to foreclose a new trial in this case, because, as discussed above, Plaintiff's trial strategy was to pursue 4% of the proceeds of the Meda sale on the basis of a promise in the Consulting Agreement. From the allegations of the Original Complaint, to closing arguments, to the briefing of the initial post-trial motions, Plaintiff never varied from its contention that Katz had an entitlement under the Consulting Agreement, of which he was wrongfully deprived. For the reasons discussed above, the evidence admitted at trial simply cannot support that claim. Therefore, the Court cannot now use Rule 15 to permit Plaintiff to try a new claim under a different theory of recovery — completely outside the contract — after Plaintiff voluntarily prosecuted its case solely under another. The Court would be using a rule designed to promote judicial efficiency to reopen a case where I entered judgment in favor of Defendants on the only claim actually tried. To do so would prejudice the Defendants.[15]

---

[15] The Court has devoted such extensive attention to Plaintiff's Rule 15(b) arguments because the Third Circuit has made clear that in some, very limited circumstances, the granting of a new trial under the Rule may be appropriate. Almost fifty years ago, in *Deakyne v. Commissioners of Lewes*, 416 F.2d 290 (3d Cir. 1969), the Third Circuit was faced with an

appeal from the denial of a Rule 15(b) motion.  In the district court proceeding below, the defendant had moved, after the close of the evidence, but before the case was submitted to the jury, to amend its answer to include a statutory defense that the defendant argued had been tried by implied consent.  The district court had allowed the parties to amend the pleadings in a supplemental pre-trial order entered on the first day of the trial and so concluded that the defendant's failure to raise the statutory defense until after the close of the evidence constituted an unreasonable delay prejudicing the plaintiff.  The district court denied the defendant's Rule 15(b) motion and submitted the case to the jury.  The jury found for the plaintiff and the defendant moved for judgment as a matter of law or a new trial under Rule 50(b).  The district court denied defendant's motion on the ground that allowing an amendment to the pleadings which would require a new trial would unduly prejudice the prevailing plaintiff.  *Deakyne v. Commissioners of Lewes*, 44 F.R.D. 425, 428 (D. Del. 1968), *rev'd,* 416 F.2d 290 (3d Cir. 1969) (it would be "unjust to require plaintiff to be subjected to the inconvenience and expense of another trial when defendants could have readily avoided the problem by timely action.").  The Third Circuit reversed and granted defendant a new trial, holding:

> We are not persuaded that appellee has shown such prejudice as to warrant a denial to the [appellant] of the right to amend its answer, if such amendment is necessary, or to deny the [appellant's] belated request for a charge on the statute. Counsel for appellee obviously was fully aware of the statute and objected to its introduction into the case mainly on legal grounds. A continuance under Rule 15(b) would have enabled appellee to meet the evidence in support of the elements of [the new defense] presented by the [appellant]. A new trial will afford appellee the same opportunity to challenge the [new defense]. . . .
>
> Appellee is prejudiced, of course, in that she gained a verdict which is now being reversed. But this is not the kind of prejudice contemplated by Rule 15(b). Prejudice under the rule means undue difficulty in prosecuting a lawsuit as a result of a change of tactics or theories on the part of the other party. We believe that any prejudice of this nature, even if present here, is minimal and may be readily relieved by the new trial to be afforded to the parties.

*Deakyne*, 416 F.2d at 299–300.  Here, unlike *Deakyne*, it is the plaintiff that seeks to introduce a new claim, proceeding under a wholly different theory of liability.  The defendant in *Deakyne* sought only to present to the jury an additional defense to liability on the existing claims in the case, which the Third Circuit found had actually been tried to the jury.  Moreover, the Third Circuit observed that the plaintiff's objection to the statutory defense was brought primarily upon legal grounds.  Here, as is made abundantly clear in Defendants' supplementary briefing, Defendants contend that the elements of Plaintiff's promissory estoppel claim are not factually supported and would no doubt seek to introduce evidence to contest Plaintiff's claim.  Moreover, unlike *Deakyne*, Plaintiff's motion was not raised until after the entry of final judgment, following a jury verdict and the Court's post-judgment request for supplementary briefing.  This Court finds that the equities weigh more heavily against the moving party where, as here, Rule 15(b) arises as an attempt for a second bite at the apple rather than, as in *Deakyne*, an attempt to charge the jury before deliberations.

Accordingly, the Court finds that a claim for promissory estoppel based upon Rosenthal's alleged promise of a discretionary "bonus" was not tried to the jury in this case by the implied consent of the parties, and so Plaintiff's Rule 15(b) motion is denied.

### C.    Plaintiff's Rule 59(d) Motion for a New Trial

The Court having determined that the pleadings in this case cannot be conformed to the evidence introduced at trial to create a promissory estoppel claim, the remaining question before the Court is whether Rule 59(d) alone, without any prior amendment of the pleadings, permits the Court to grant a new trial on causes of action not originally submitted to the jury.[16] Here, it is clear that although evidence relevant to Plaintiff's proposed promissory estoppel, equitable estoppel, and even breach of contract theories, was introduced at trial, the jury was not charged on such claims and did not render a verdict on them — promissory and equitable estoppel based upon Defendants' post-agreement conduct were never pleaded by Plaintiff, and breach of contract was dismissed by this Court on Defendants' motion for summary judgment.

The Third Circuit has "described a Rule 59 motion as a device to relitigate the original issue" contested at trial. *Smith v. Evans*, 853 F.2d 155, 158 (3d Cir. 1988) (emphasis added). As of yet, the Circuit Court has not opined whether Rule 59 may be used to relitigate *only* the original issue tried. Courts in other jurisdictions and other respected legal authorities, however, have so

---

[16] In their supplementary briefing, Defendants also argue that any action by this Court under Rule 59(d) would be untimely as more than 28 days have elapsed since the entry of final judgment in this case. Because the Court finds that relief under Rule 59(d) is not warranted on other grounds, it need not decide the timeliness of any such relief, but observes, without deciding, that Defendants' argument appears to mistakenly calculate the time for ordering a new trial from the entry of judgment in favor of Plaintiff based upon the jury's verdict. As the prevailing party, Plaintiff would have no cause to seek a new trial from that judgment. The appropriate inquiry on timeliness, therefore, would appear to concern whether the Court could properly construe Plaintiff's supplementary briefing as a timely motion for a new trial seeking relief from this Court's Rule 50(b) judgment as a matter of law in favor of Defendants.

interpreted the rule.  In one of the more widely cited opinions, the Circuit Court of Appeals for the District of Columbia held that:

> Ordinarily Rule 59 motions for either a new trial or a rehearing are not granted by the District Court where they are used by a losing party to request the trial judge to reopen proceedings in order to consider a new . . . theory which could have been raised during the original proceedings.

*Grumman Aircraft Eng'g Corp. v. Renegotiation Bd.*, 482 F.2d 710, 721 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 168 (1975).  *See also* 11 Wright & Miller Fed. Prac. & Proc. Civ. § 2805 (3d ed.) ("a party may not seek a second trial on the basis of a theory not urged at the first trial); *id.* at § 2814 ("[a] partial new trial will not be granted to try a new issue that was not litigated at the first trial."); *Merrill v. Cty. Of Madera*, 389 F. App'x 613, 615 (9th Cir. 2010) ("a Rule 59(a) motion for new trial is not available on claims or causes of actions for which Plaintiffs never received a trial.").  This Court finds these authorities persuasive.

Moreover, from the Third Circuit precedent which is available, it appears that, at the very least, it is within the Court's discretion to deny retrial on a new claim not previously tried.  In *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240 (3d Cir. 2006), the plaintiff initially pleaded claims under the Fair Labor Standards Act ("FLSA") and New Jersey Law Against Discrimination ("NJ LAD").  *Id.* at 245.  The case went to trial, and, after Plaintiff's case-in-chief, Defendant moved for judgment as a matter of law on Plaintiff's FLSA claim under Fed. R. Civ. P. 50(a).  *Id.*  Plaintiff consented to Defendant's motion, and the Court dismissed the claim prior to the submission of the remainder of the case — Plaintiff's NJ LAD claim — to the jury.  *Id.* at 253. The jury found in favor of Defendant and Plaintiff filed a post-judgment motion for a new trial, pursuant to Fed. R. Civ. P. 59(a).[17]  *Id.*  Plaintiff's motion sought a new trial on both his NJ LAD

---

[17] *Armstrong* actually involved two trials at the district Court level.  Plaintiff's FLSA claim was initially dismissed on Defendant's Rule 50(a) motion in the first trial.  The district

and FLSA claims.  The district court denied Plaintiff's motion, and Plaintiff appealed.  *Id.*  The Third Circuit partially reversed, finding that the district court had misapplied the elements of NJ LAD, and granted Plaintiff a new trial on his NJ LAD claim.  *Id.*  The Circuit Court, however, affirmed the district court's denial of a new trial on the previously dismissed FLSA claim, holding that "the District Court did not abuse its discretion by ordering a new trial on the . . . claims that were decided by the jury while denying retrial on an issue previously dismissed for lack of evidence."  *Id.* at 253.

Here, this Court dismissed Plaintiff's breach of contract claim on summary judgment. Similarly, Plaintiff's promissory estoppel claim was, as discussed above, either never pleaded or, as pleaded, was dismissed by the Court on Defendant's Rule 12 motion.  Consistent with *Armstrong* and the aforementioned persuasive authorities, the only proper subject of a Rule 59 motion by Plaintiff would have been the breach of the duty of good faith and fair dealing claim that was actually submitted to the jury.  Retrial on the previously dismissed or otherwise unpleaded promissory estoppel, equitable estoppel, and breach of contract claims would be inappropriate and, accordingly, is denied.

### D.     Defendants' Motion for a New Trial.

Because I have determined that Defendants are entitled to judgment as a matter of law, I will not address Defendants' alternative request for a new trial pursuant to Federal Rule of Civil Procedure 59(a).  Accordingly, Defendants' motion for a new trial is DENIED as moot.

---

court, however, reaffirmed its decision dismissing the claim in the second trial, so that the same claim — Plaintiff's NJ LAD claim — was submitted to the jury in both trials.  *Id.* at 245.  In the first trial, the jury found for Plaintiff.  Defendant moved for a new trial, which was granted.  In the second trial, the jury found for Defendant and Plaintiff appealed.  *Id.* at 253.  As *Armstrong*'s procedural posture does not affect its relevance to this Court's decision, the Court has reproduced it in the simplified form above.

**E.      Plaintiff's Motion Prejudgment Interest.**

As discussed in more detail above, this Court grants Defendant CIH's motion for a judgment as a matter of law.  Accordingly, Plaintiff's motion to amend the judgment to include an award of prejudgment interest is DENIED as moot.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Rule 50(b) motion for a judgment as a matter of law is GRANTED; Defendants' Rule 59(a) motion for a new trial and Plaintiff's Rule 59(e) motion to alter judgment are DENIED as moot; and Plaintiff's Rule 15(b) motion to conform the pleadings or, in the alternative for a new trial under Rule 59(d) is DENIED.  An appropriate Order will follow.


Dated:  _____2/14/2017_____                    _____/s/ Freda L. Wolfson_____
                                                The Honorable Freda L. Wolfson
                                                United States District Judge